JOSEPH W. COTCHETT (36324)
jcotchett@cpmlegal.com
MARK C. MOLUMPHY (168009)
mmolumphy@cpmlegal.com
NANCY L. FINEMAN (124870)
nfineman@cpmlegal.com
BRYAN M. PAYNE (272971)
bpayne@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Phone: (650) 697-6000
Fax: (650) 697-0577

*Attorneys for Plaintiff Christopher Liberty,*
*derivatively on behalf of FedEx Corporation*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER LIBERTY, derivatively on behalf of FEDEX CORPORATION, <br><br> Plaintiff, <br><br> vs. <br><br> FREDERICK W. SMITH; JAMES L. BARKSDALE; JOHN A. EDWARDSON; SHIRLEY ANN JACKSON; STEVEN R. LORANGER; GARY W. LOVEMAN; R. BRAD MARTIN; JOSHUA COOPER RAMO; SUSAN C. SCHWAB; DAVID P. STEINER; and PAUL S. WALSH, <br><br> Defendants, <br><br> -and- <br><br> FEDEX CORPORATION, <br><br> Nominal Defendant. | Case No. <br><br> **SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> 1. **BREACH OF FIDUCIARY DUTY;** <br><br> 2. **CORPORATE WASTE;** <br><br> 3. **UNJUST ENRICHMENT; and** <br><br> 4. **VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT** <br><br> **JURY TRIAL DEMANDED** |

**SHAREHOLDER DERIVATIVE COMPLAINT**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION...................................................................................... 1

II.   JURISDICTION ....................................................................................... 5

III.  VENUE...................................................................................................... 6

IV    PARTIES ................................................................................................... 7

      A.    PLAINTIFF .................................................................................... 7

      B.    DEFENDANTS .............................................................................. 7

            1. Nominal Defendant................................................................... 7

            2. Individual Defendants .............................................................. 7

            3. Aiding and Abetting/Conspiracy ........................................... 10

            4. Unnamed Participants ............................................................ 11

V.    STATEMENT OF FACTS .................................................................... 11

      A.    FedEx and the Explosion of E-Commerce............................... 11

      B.    FedEx Governance Structure To Monitor Compliance With
            Applicable Laws ........................................................................... 12

      C.    The Criminal Charges in the Superseding Indictment Reveal FedEx's
            Knowing And Illegal Participation In Distributing, and Laundering
            Money From the Sale of, Prescription Drugs By Internet Retailers ............. 24

VI.   THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE
      AND MISLEADING PROXY STATEMENTS ................................... 29

VII.  RESPONSIBILITIES OF OFFICERS AND DIRECTORS................ 46

VIII. DEMAND FUTILITY ALLEGATIONS .............................................. 48

      A.    Demand is Futile as to Defendant Smith................................... 52

      B.    Demand is Futile as to Defendant Barksdale ........................... 53

      C.    Demand is Futile as to Defendants Edwardson and Loveman ...................... 54

      D.    Demand is Futile as to Defendants Jackson and Walsh .......... 55

      E.    Demand is Futile as to Defendant Loranger.............................. 56

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    i

F.   Demand is Futile as to Defendants Martin and Ramo ...................................... 57

G.   Demand is Futile as to Defendant Schwab ........................................................ 58

H.   Demand is Futile as to Defendant Steiner........................................................ 59

IX.   <u>CAUSES OF ACTION</u> ............................................................................................ 60

FIRST CLAIM FOR RELIEF –
BREACH OF FIDUCIARY DUTY.......................................................................... 60

SECOND CLAIM FOR RELIEF –
CORPORATE WASTE .............................................................................................. 63

THIRD CLAIM FOR RELIEF –
UNJUST ENRICHMENT ......................................................................................... 63

FOURTH CLAIM FOR RELIEF –
VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT............................ 64

X.   <u>PRAYER FOR RELIEF</u> ............................................................................................ 66

XI.   <u>JURY DEMAND</u> ...................................................................................................... 67

Plaintiff Christopher Liberty ("Plaintiff") derivatively on behalf of FedEx Corporation (hereby referred to as "FedEx" or "the Company") brings this action against Defendants James L. Barksdale, John A. Edwardson, Shirley Ann Jackson, Steven R. Loranger, Gary W. Loveman, R. Brad Martin, Joshua Cooper Ramo, Susan C. Schwab, Frederick W. Smith, David P. Steiner, and Paul S. Walsh (hereinafter referred to collectively as "Defendants" or "Individual Defendants") for violations of the law.   Except as to the allegations pertaining to himself, which are alleged upon Plaintiff's personal knowledge, Plaintiff alleges the following upon information and belief  based on the investigation of Plaintiff and his counsel, including, among other things, a review of legal and regulatory filings, press releases and media reports about FedEx.

## I.

## INTRODUCTION

1.      This action arises out of FedEx's participation in the illegal distribution of pharmaceuticals from internet pharmacies, for years, despite clear warnings from government regulators to stop the practice.  Defendants, comprising the Company's most senior management and members of its Board of Directors, not only failed to monitor and curb the Company's distribution of illegal drugs, but allowed the Company to set up special procedures to ensure the practice *continued* so as not to lose valuable revenues.

2.      FedEx shareholders were unaware of this illicit practice.  To the contrary, FedEx's Board has used the Company's Proxy Statements to promote its commitment to legal practices under the leadership of Frederick Smith, the founder of FedEx, and who has served as both Chairman of the Board and Chief Executive Officer since 1977.  According to Defendants, Smith enabled FedEx to become "one of the most trusted and respected brands in the world." The Board – a majority of which have served for many years, at Smith's behest – also used the Proxies to urge shareholders to re-elect themselves as members and to reject efforts to appoint an Independent Chair of the Board, highlighting the Company's supposedly robust internal controls and risk management practices to ensure the Company was law abiding.

3.      However, on July 17, 2014, FedEx's false facade was revealed when the United States Attorney for the Northern District of California announced that FedEx had been

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    1

1  ***criminally indicted*** by a grand jury in San Francisco, California.  The criminal indictment

2  followed a nine-year investigation of FedEx by government regulators, and detailed the

3  Company's knowing decision to distribute illegal drugs despite warnings from regulators.  U.S.

4  Attorney Melinda Haag stated:

5  
6  > The advent of Internet pharmacies allowed the cheap and easy distribution of
> massive amounts of illegal prescription drugs to every corner of the United States,
> while allowing perpetrators to conceal their identities through the anonymity the
7  > Internet provides.  This indictment highlights the importance of holding
> corporations that knowingly enable illegal activity responsible for their role in
8  > aiding criminal behavior.

9  Similarly, DEA Special Agent in Charge Jay Fitzpatrick stated:

10  
11  > Pharmaceutical drug abuse is a serious problem affecting millions of consumers
> in the United States.  While DEA is committed to ensuring patients receive
> legitimate prescriptions, today's action should send a strong message that
12  > corporations that participate in illegal activity risk investigation and prosecution.

13  Philip Walsky, Acting Director of the FDA's Office of Criminal Investigations stated:

14  
15  > Illegal Internet pharmacies rely on illicit Internet shipping and distribution
> practices. Without intermediaries, the online pharmacies that sell counterfeit and
> other illegal drugs are limited in the harm they can do to consumers.  The FDA is
16  > hopeful that today's action will continue to reinforce the message that the public's
> health takes priority over a company's profits.

17      4.      On August 14, 2014, the Justice Department filed a superseding indictment

18  ("Indictment" or "Superseding Indictment") charging FedEx with an additional three counts of

19  knowingly and intentionally conspiring to launder money in connection with its distribution of

20  illegal prescription drugs.  The Superseding Indictment details a decade-long conspiracy, from at

21  least 2000 to 2010, whereby FedEx laundered money derived from the same "knowing and

22  intentional" criminal misconduct set forth in the original indictment.

23      5.      The Superseding Indictment revealed for the first time that FedEx was allegedly

24  aware that it shipped illegal prescription drugs to drug addicts, underage persons and individuals

25  who either died, or accidentally caused another to die, as a result of drug overdose.  According to

26  the Superseding Indictment, "FedEx delivered controlled substances and prescription drugs" that

27  caused the death of individuals as early as August 2002 and as late as March 2009.

28  

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**      2

6.     The federal government's ongoing investigation demonstrates that FedEx senior executives were aware of this misconduct.  For example, a FedEx internal memo distributed to the Vice President of Worldwide Revenue Operations and Managing Director of Security stated:

> Many online pharmacy customers have been closed by the federal government due to fraud and illegal sales of controlled pharmaceutical products.  In a recent case, a teenager died after being illegally supplied with a controlled drug that was delivered by FedEx.

7.     Defendants can no longer claim ignorance of the facts. The Superseding Indictment demonstrates that FedEx was able to monitor and link sales of prescription drugs from the illicit pharmacies to the customers.  This contradicts Defendants' previous excuse that FedEx was unable to monitor, curb, or prevent the illicit sales. The Superseding Indictment alleges specifically that, in 2004 and 2005, FedEx was able to identify, and thus curb or prevent, illicit sales.  Despite these stark revelations, Defendants stubbornly refuse to take responsibility for their failure to correct known problems.

8.     As alleged, the criminal conduct described in the Superseding Indictment was open and notorious at FedEx, and government regulators informed FedEx "senior management" of the conduct "on no less than six different occasions" starting in 2004.  The Superseding Indictment followed a 9-year investigation and set forth allegations of misconduct that began as early as 2000 and continued unabated throughout the relevant period.  During the relevant time period, the Defendants all served as FedEx Directors and Board-level committee members with specific oversight and monitoring responsibilities over the alleged misconduct that is the subject of this Complaint.  Nine of the eleven Defendants were Board and Board-level committee members before and throughout the relevant period (Smith, Barksdale, Jackson, Walsh, Edwardson, Loranger, Loveman, Schwab and Steiner) while the final two Defendants (Martin and Ramo) joined in the middle of the nearly decade-long criminal investigation.  Rather than take measures to curb or stop the known criminal misconduct, the Defendants, FedEx Board and Board-level committee members responsible for overseeing FedEx, consciously chose to abdicate their fiduciary duties and permit the conduct to continue unabated for years.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                                          3

9.      The conduct, and the resulting Superseding Indictment, have been devastating to the Company and its shareholders. In addition to the legal expenses reputational harm already incurred, FedEx has been exposed to criminal proceedings in which the government is seeking a maximum fine of twice the revenues that FedEx made on delivering illegal drugs, or approximately $1.6 billion. This amounts to 46.4% of FedEx's operating profits for the fiscal year 2014. This conduct would not have occurred absent Defendants' knowledge or bad faith disregard of their fiduciary obligations to the Company.

10.      Defendants made the conscious decision to continue distributing drugs that FedEx knew were illegally sold and causing deaths. The decision to reap the financial benefits of this business, with knowledge of the illegal and devastating effects of the business, constituted an abdication of the Defendants' fiduciary duties.

11.      Most troubling, the present Board refuses to accept any responsibility, and has repeatedly declared its position that the Company had and has no duty to stop the shipment of illegal pharmaceutical from internet pharmacies. Thus, absent injunctive relief, business will continue as usual.

12.      Plaintiff brings this action against the Defendants to recover for the substantial harm incurred by FedEx. As alleged, Defendants knowingly authorized or recklessly allowed FedEx to commit multiple fraudulent and deceptive acts in permitting the illegal distribution of drugs from internet pharmacies. Defendants breached their fiduciary duties by abdicating their responsibilities to properly supervise and adequately oversee FedEx's distribution business to ensure it was conducted legally and in compliance with federal laws. Finally, Defendants knowingly allowed FedEx to misrepresent to the public the robust risk management and internal controls it supposedly implemented to ensure that FedEx complied with rules and regulations applicable to its business, while failing to inform investors about its actual practices.

## II.

## JURISDICTION

13.     This Court has subject matter jurisdiction over this action under Article III of the United States Constitution and 28 U.S.C. § 1332 because Plaintiff resides in different states than Defendants and the amount in controversy exceeds the jurisdictional minimum of this Court. The Court also has subject matter jurisdiction in this action arising under Article III of the United States Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.  The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     This Court has jurisdiction over the Defendants.  Each Defendant has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.  FedEx has substantial business operations in California, and a substantial portion of the illegal drug distribution operations was conducted in California.  California is, and at all relevant times was, one of the states with the largest number of FedEx customers and distribution locations.  For example, California has more FedEx "SmartPost Hubs" in California than in any other state.  Since 1988, FedEx has operated one of its six "Super Hubs" in Oakland, California, where an average of 250,000 packages pass through the facility each day.  The California Super-Hub allows FedEx to access most markets in the Western United States and Canada, and packages destine for western states are transported here, sorted, and sent onto their destinations.  In addition to the Super-Hub in Oakland, FedEx operates ramps at the San Francisco, San Jose, and Sacramento Airports

15.     All of the Defendants were involved with or responsible for FedEx's policies and procedures in regards to the relevant conduct at issue, through their roles as FedEx Board and Board-level committee members with oversight responsibility over conduct that occurred in California and impacted California and California citizens.  Defendants also either knowingly or with reckless disregard of the truth concealed information from persons and shareholders in California regarding the Company's misconduct.

16.     The action is not a collusive one to confer jurisdiction that the court would otherwise lack.

### III.

### VENUE

17.     Venue in this District is appropriate.  The criminal investigation relating to FedEx's illegal distribution of pharmaceutical drugs has been conducted in the Northern District of California by the United States Attorney for the Northern District of California.

18.     On two occasions a San Francisco federal grand jury issued criminal indictments charging FedEx with conspiracy and criminal misconduct.  On July 17, 2014, the U.S. Attorney filed the original indictment against FedEx in the Northern District of California,  *United States of America v. FedEx Corporation, et al.*, Case No. CR 14-380-WHO, alleging violations of 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances); 21 U.S.C. § 841 (Distribution of Controlled Substances); 18 U.S.C. § 371 (Conspiracy to Distribute Misbranded Drugs); 21 U.S.C. §§ 331, 333 and 353 (Misbranding Drugs), and; 18 U.S.C. § 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461 (Forfeiture).  On August 14, 2014, the U.S. Attorney filed a Superseding Indictment, adding three 18 U.S.C. § 1956 (Conspiracy to Launder Money) to the existing charges in the original indictment.

19.     Defendants caused substantial harm and injury in this District.  As alleged throughout this Complaint, and in the criminal indictments, a substantial part of the events or omissions giving rise to the claims alleged occurred in California, including in this District.  For example, this Superseding Indictment alleges that FedEx violated criminal statutes by its delivery of packages to persons located in the Northern District of California, including delivery of controlled prescription drugs to customers in San Mateo, Redwood City, Napa, and Saratoga, California, and delivery of controlled prescription drugs to fill in order placed by DEA agents in San Jose, California.

## IV.

## PARTIES

**A.   PLAINTIFF**

20.      Plaintiff Christopher Liberty is a California citizen and the beneficial owner of 1,000 shares of FedEx stock, which he has owned since 1996.  Thus, Plaintiff has owned FedEx shares at all times relevant hereto and continues to be a FedEx shareholder.

**B.   DEFENDANTS**

      **1.      Nominal Defendant**

21.      Nominal defendant **FEDEX CORPORATION ("FedEx")** is a company incorporated in Delaware with its principal place of business located in Tennessee.  A citizen of the states of Delaware and Tennessee, FedEx does business worldwide.  FedEx conducts a majority of its business in the United States and substantial business in the State of California.  As alleged above, FedEx was recently criminally indicted in the Northern District of California, located in San Francisco, California.

      **2.      Individual Defendants**

22.      The Individual Defendants consist of the following current or former members of the Board of Directors of FedEx, and certain current officers of FedEx:

23.      Defendant **FREDERICK W. SMITH** is a citizen of the state of Tennessee.  Smith has Frederick W. Smith has served as a FedEx director since 1971.  He is the Company's founder and has been Chairman, President and Chief Executive Officer of FedEx since 1998 and Chairman of FedEx Express since 1975.  He was Chairman, President and Chief Executive Officer of FedEx Express from 1983 to 1998, Chief Executive Officer of FedEx Express from 1977 to 1998, and President of FedEx Express from 1971 to 1975.

24.      Defendant **JAMES L BARKSDALE** is a citizen of the state of Mississippi.  Barksdale was been a director of FedEx since 1999, and is currently the Chair of Board's Information Technology Oversight Committee and a member of the Nominating & Governance Committee.  He is also Chairman and President of Barksdale Management Corporation, an investment management company, and Managing Partner of The Barksdale Group, a venture

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    7

capital firm, positions he has held since 1999. He was President and Chief Executive Officer of Netscape Communications Corporation from 1995 to 1999. Barksdale previously held various senior management positions at FedEx Express from 1979 to 1992, including Executive Vice President and Chief Operating Officer. He also served as a director of FedEx Express from 1983 to 1991.

25. Defendant **JOHN A. EDWARDSON** is a citizen of the state of Florida. Edwardson has been a director of FedEx since 2003, and is currently the Chair of the Board's Audit Committee. He is the former Chairman and Chief Executive Officer of CDW Corporation, a provider of technology products and services, serving as Chief Executive Officer from 2001 to September 2011 and as Chairman from 2001 to December 2012. He was also Chairman and Chief Executive Officer of Burns International Services Corporation, a provider of security services, from 1999 to 2000. He was President and Chief Operating Officer of UAL Corporation (the parent company of United Air Lines, Inc.) from 1995 to 1998.

26. Defendant **SHIRLEY ANN JACKSON** is a citizen of the state of New Jersey. Jackson has been a director of FedEx since 1999, and is currently a member of Board's Compensation and Nominating & Governance Committees. She is President of Rensselaer Polytechnic Institute (RPI), a position she has held since 1999. She is also a director of International Business Machines Corporation, Marathon Oil Corporation, Medtronic, Inc. and Public Service Enterprise Group Incorporated, and was previously a director of NYSE Euronext and United States Steel Corporation.

27. Defendant **STEVEN R. LORANGER** is a citizen of the state of Arizona. Loranger has been a director of FedEx since 2006, and is currently the Chair of the Board's Compensation Committee. He is the Chief Executive Officer and President of Xylem Inc., a water technology company, and a position he has held since September 2013. He was previously the Chairman, President and Chief Executive Officer of ITT Corporation, a high-technology engineering and manufacturing company. He was also the Executive Vice President and Chief Operating Officer of Textron Inc., a global aircraft, industrial and finance company, from 2002 to 2004. He held various executive positions at Honeywell International Inc. and its predecessor,

1   AlliedSignal, Inc., a technology and manufacturing company, from 1981 to 2002, including

2   President and Chief Executive Officer of its Engines, Systems and Services businesses. He is a

3   director of Xylem Inc. and a former director of ITT Corporation and Exelis, Inc.

4       28.     Defendant **GARY W. LOVEMAN** is a citizen of the state of North Carolina.

5   Loveman has been a director of FedEx since 2007, and is currently a member of the Board's

6   Audit Committee.  He is the Chairman of the Board, Chief Executive Officer and President of

7   Caesars Entertainment Corporation (formerly Harrah's Entertainment, Inc.), and has held the

8   position of President since 2001, Chief Executive Officer since 2003, and Chairman of the Board

9   since 2005.  He held various other executive positions at Caesars Entertainment Corporation

10  from 1998 to 2001.  He is a director of Caesars Entertainment Corporation and Coach, Inc.

11      29.     Defendant **R. BRAD MARTIN** is a citizen of the state of Tennessee.  Martin has

12  been a director of FedEx since 2011, and is currently a member of the Board's Audit and

13  Information Technology Oversight Committees.  He is the Chairman of RBM Venture Company,

14  a private investment company, a position he has held since 2007.  He was Chairman and Chief

15  Executive Officer of Saks Incorporated from 1989 to 2006 and remained Chairman until 2007,

16  when he retired.  He is a director of Chesapeake Energy Corporation and First Horizon National

17  Corporation.  He was previously a director of Caesars Entertainment Corporation (formerly

18  Harrah's Entertainment, Inc.), Dillards, Inc., Gaylord Entertainment Company, lululemon

19  athletica Inc., and Ruby Tuesday, Inc.

20      30.     Defendant **JOSHUA COOPER RAMO** is a citizen of the state of New Mexico.

21  Ramo has been a director of FedEx since 2011, and is currently a member of the Board's Audit

22  and Information Technology Oversight Committees.  He is Vice Chairman of Kissinger

23  Associates, Inc., a strategic advisory firm, a position he has held since 2011. He served as

24  Managing Director of Kissinger Associates from 2006 to 2011. Prior to joining Kissinger

25  Associates, he was Managing Partner of JL Thornton & Co., LLC., a consulting firm.  He is a

26  director of Starbucks Corporation.

27      31.     Defendant **SUSAN C. SCHWAB** is a citizen of the state of Maryland.  Schwab

28  has been a director of FedEx since 2009, and is currently a member of the Board's Compensation

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    9

1    and Information Technology Oversight Committees.  She has been affiliated in various

2    capacities with the University of Maryland since 1995 and also served as a strategic advisor to

3    Mayer Brown LLP, a law firm, since March 2010.  She is a director of The Boeing Company and

4    Caterpillar Inc., and was previously a director of The Adams Express Company, Calpine

5    Corporation and Petroleum & Resources Corporation.

6        32.    Defendant **DAVID P. STEINER** is a resident of the state of Texas.  Steiner has

7    served as a FedEx director since 2009, and is currently the Chair of the Board's Nominating &

8    Governance Committee.  He is Chief Executive Officer of Waste Management, Inc., a provider

9    of integrated waste management services, a position he has held since 2004.  He was Executive

10   Vice President and Chief Financial Officer of Waste Management, Inc. from 2003 to 2004,

11   Senior Vice President, General Counsel and Corporate Secretary of Waste Management, Inc.

12   from 2001 to 2003, and Vice President and Deputy General Counsel of Waste Management, Inc.

13   from 2000 to 2001.  He was a partner at Phelps Dunbar L.L.P., a law firm, from 1990 to 2000.

14   He is a director of TE Connectivity Ltd. (formerly Tyco Electronics Ltd.) and Waste

15   Management, Inc.

16       33.    Defendant **PAUL S. WALSH** is a resident of the state of Minnesota.  Walsh has

17   served as a FedEx director since 1996, and is currently a member of the Board's Compensation

18   and Nominating & Governance Committees.  He is an executive advisor to Diageo plc, a

19   beverage company, a position he has held since his retirement as Chief Executive Officer in June

20   2013.  He was Chief Executive Officer of Diageo plc from 2000 to June 2013. He was Chairman,

21   President and Chief Executive Officer of The Pillsbury Company, a wholly owned subsidiary of

22   Diageo plc, from 1996 to 2000, and Chief Executive Officer of The Pillsbury Company from

23   1992 to 1996.  He was appointed Chairman of Compass Group plc, a catering company, effective

24   January 2014.  He is also a director of Avanti Communications Group plc, Diageo plc and

25   Unilever PLC, and previously a director of Centrica plc.

26       **3.    Aiding and Abetting/Conspiracy**

27       34.    Defendants, and each of them, are sued as participants and as aiders and abettors

28   in the conduct herein alleged.  At all relevant times, each Defendant was the agent of each of the

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    10

1   remaining Defendants and, in doing the acts alleged herein, was acting within the course and

2   scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of

3   the other defendants.  There is a unity of interest and ownership between the Defendants listed

4   above, such that the acts of the one are for the benefit and can be imputed as the acts of the

5   others.

### 4.      Unnamed Participants

7       35.     Numerous individuals and entities participated actively during the course of and

8   in furtherance of the scheme described herein.  The individuals and entities acted in concert by

9   joint ventures and by acting as agents for principals in order to advance the objectives of the

10  scheme to benefit Defendants and themselves to the detriment of FedEx and its shareholders,

11  including the named Plaintiff in this action.

### V.

### STATEMENT OF FACTS

**A.     FedEx and the Explosion of E-Commerce**

15      36.     Founded in 1971, FedEx is now the world's largest express transportation

16  company.  It has four major service segments: FedEx Express, FedEx Ground, FedEx Freight,

17  and FedEx Services.  FedEx Services segment provides "sales, marketing, information

18  technology, communications and back-office support" to FedEx's transportation segments.

19      37.     Over the past decade, FedEx's revenues have become increasingly dependent on

20  retail sales and shipping, and specifically, the explosive growth of online shopping on the

21  internet or "e-commerce."

22      38.     In its Annual Reports, FedEx stated that "the largest driving force in the global

23  economy is e-commerce, which is projected to reach $1 trillion in sales by 2016" and that "the

24  internet shopping boom is translating into significant growth at FedEx."

25      39.     To maximize its e-commerce revenues, FedEx aggressively touted its "specialized

26  e-commerce services and tools" to internet-based retailers.  These "services and tools" include

27  FedEx Home Delivery, a dedicated residential delivery services launched in 2000.  FedEx

28  SmartPost was launched in 2004 as a means for online retailers to ship lightweight shipments

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    11

and promote free shipping as a marketing tool.  Today, about 50 percent of online purchases come with free shipping.  FedEx also promoted its large network of FedEx office locations and Express service centers to "securely hold packages for customers to pick up."

40.    Similarly, on its own website, FedEx offered internet retailers or "e-tailers" retailing, supply chain, packaging, shipping and other logistical advice.  FedEx also promoted its "web integration solutions" which let internet retailers offer dynamic shipping-related services directly from their website and internal business applications.  For example, FedEx Web Integration Wizard allowed a retailer to automatically integrate FedEx's shipping and delivery services onto its website, so that FedEx and the retailer could closely monitor sales and shipping information.

**B.    FedEx Governance Structure To Monitor Compliance With Applicable Laws**

41.    Given the enterprise risks of a shipping company, FedEx purportedly set up a robust corporate governance structure to ensure it was closely monitoring its compliance with legal requirements applicable to its business.

42.    Indeed, in its public statements, website, and SEC filings, FedEx repeatedly highlighted its strong corporate governance structure, independent Board and Board Committees, and robust risk management internal controls to ensure that "corporate activities will be conducted to the highest ethical and professional standards."  FedEx also published a number of documents that described its supposed commitment to complying with all laws and regulations relevant to its business.

43.    For example, FedEx published the following "Mission Statement":

> FedEx Corporation will produce superior financial returns for its shareowners by providing high value-added logistics, transportation and related business services through focused operating companies. Customer requirements will be met in the highest quality manner appropriate to each market segment served. FedEx will strive to develop mutually rewarding relationships with its employees, partners and suppliers. Safety will be the first consideration in all operations. ***Corporate activities will be conducted to the highest ethical and professional standards***.

Emphasis added.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    12

44.     FedEx also published its "Corporate Governance Guidelines," which stated in pertinent part:

## CORPORATE GOVERNANCE GUIDELINES

The Board of Directors has adopted these Guidelines to further its longstanding goal of providing effective governance of the Company's business and affairs for the long-term benefit of the Company's stockholders. These Guidelines are reviewed periodically and revised as appropriate to ensure the effective functioning of the Board of Directors and high quality corporate governance.

**Board Responsibilities**

1.     *Basic Responsibilities of Board Members*. The fundamental responsibility of members of the Company's Board of Directors is to promote the best interests of the Company and its stockholders by overseeing the management of the Company's business and affairs.  In doing so, Board members have two basic legal obligations to the Company and its stockholders: (a) the duty of care, which generally requires that Board members exercise appropriate diligence in making decisions and in overseeing management of the Company, and (b) the duty of loyalty, which generally requires that Board members make decisions based on the best interests of the Company and its stockholders and without regard to any personal interest. . . .

3.     *Board Risk Oversight*. The Board of Directors has ultimate responsibility for risk oversight.  While management has day-to-day responsibility for assessing and managing the Company's risk exposure, the Board of Directors and its committees provide oversight in connection with those efforts, with particular focus on ensuring that the Company's risk management practices are adequate and regularly reviewing the most significant risks facing the Company.  The Board of Directors has delegated to each of its committees responsibility for the oversight of specific risks that fall within the committee's areas of responsibility.

4.     *Compliance and Ethics*. The Board of Directors is responsible for monitoring the Company's compliance with legal and regulatory requirements and overseeing the implementation and effectiveness of the Company's compliance and ethics programs.  The Board has delegated much of this responsibility to the Nominating & Governance Committee.  In furtherance of this responsibility, the Nominating & Governance Committee, in consultation with the Audit Committee, will periodically discuss compliance and ethics with the Company's General Counsel or his or her designees.  In addition, the Nominating & Governance Committee will periodically review the Company's Code of Business Conduct and Ethics, which sets forth the

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    13

basic ethical principles all Board members, officers, employees and contractors must follow, and recommend any proposed changes to the Board of Directors for approval. . . .

**Board Operation** . . . .

20.      *Meeting Attendance and Preparation*. Board members are expected to attend all Board meetings and meetings of committees on which they serve, to spend the time needed to review materials in advance of such meetings, to participate in such meetings, and to meet as frequently as necessary to properly discharge their responsibilities. In advance of each Board meeting and Board committee meeting, Board members will receive the proposed agenda and other materials important to the Board's understanding of the matters to be considered. In addition, every week Board members will receive and should review materials designed to keep them well informed as to the most significant aspects of the Company's business, performance and prospects.

21.      *Board Access to Management*. Each Board member has complete and open access to any member of the Company's management. In addition, members of the Company's senior management routinely attend Board meetings and Board committee meetings and, together with other managers, brief the Board and its committees on particular topics. The Board encourages the Company's senior management to offer presentations at such meetings by managers who can provide additional insight into items being considered or who have potential for greater responsibility and should be given exposure to the Board.

22.      *Board Access to Independent Advisors*. The Board of Directors and each Board committee have the authority, to the extent they deem necessary or appropriate to carry out their respective duties, to retain independent legal, financial or other advisors and to approve each such advisor's fees and other retention terms. . . .

**Board Committees** . . . .

28.      *Committee Meeting Rules and Procedures*. The chairperson of each Board committee, in consultation with the committee members and appropriate members of management, will (a) determine the rules and procedures for the conduct of business at each committee meeting, including the length of the meeting, and (b) develop the agenda for each committee meeting. Unless otherwise requested by the committee, the committee meeting will be held with the Executive Vice President, General Counsel and Secretary or his or her designee present to record the minutes, which will then be approved by the committee at the next regularly scheduled committee meeting.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    14

45.     According to FedEx's Corporate Governance Guidelines cited above, the Board's Nominating & Governance Committee had the duty to review the Company's Code of Business Conduct and Ethics, which sets forth the basic ethical principles all Board members, officers, employees and contractors must follow, and recommend any proposed changes to the Board of Directors for approval.  This Code of Business Conduct and Ethics, publically made available on FedEx's website, included an opening "Letter from the Chairman" stating in pertinent part:

## Letter from the Chairman

Throughout the world, the FedEx name is synonymous with integrity and reliability.  Our reputation is an important strategic asset -- it is up to all of us to protect and enhance it.  In today's environment, our strong corporate reputation is invaluable.

We have a long-standing commitment to complying with the law wherever we operate and striving to maintain a high standard of business and personal ethics.

Every FedEx director, officer and employee is expected to comply with the policies set forth in this Code of Business Conduct and Ethics . . . .

Our officers, directors and managers have the additional responsibility of promoting the principles set forth in this Code and fostering a culture in which ethical conduct is recognized, valued and exhibited by all team members.   Our commitment to doing the right thing depends on your ability to set the proper tone and to address suspected violations promptly with care and respect.

Our commitment to maintaining the highest ethical and professional standards is an integral part of our Purple Promise to make every FedEx experience outstanding.  Thank you for taking the time to read, understand and comply with this Code, and for your continuing dedication and hard work.

Sincerely,

Frederick W. Smith
Chairman, President and Chief Executive Officer

46.     Within the Code of Business Conduct and Ethics, FedEx described the obligations of its directors and employees to engage in lawful behavior as well as the potentially disastrous repercussions of allowing FedEx to participate in illegal conduct:

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    15

## Lawful and Ethical Behavior

Lawful and ethical behavior is critical to our continued success and is required. You must comply with those laws and regulations relating to your business conduct. In addition, you must avoid and report any activity that involves, or could lead to the involvement of, FedEx in any potentially unlawful practice. Accordingly, you must understand the laws and regulations relevant to your work and comply with the legal requirements of the country where you are working. . . .

The laws that govern our activities may be complex, but ignorance of the law does not excuse you from your obligation to comply. . . .

Nor should you participate in or facilitate any illegal conduct by others. . .

Managers are responsible for their own and for their employees' adherence to this Code. We must ensure that we act lawfully and ethically at all times, even if it costs us business or profits in the short term. Lawful and ethical behavior is in our long-term best interests, as it maintains our excellent reputation for trustworthiness and reliability. Proper business conduct encourages loyalty from our team members, vendors and customers and fosters a mutually beneficial relationship between FedEx and the communities in which we operate.

47. In addition to these public assurances posted on its website, FedEx promoted its strong Board structure and risk oversight function in its annual Proxy Statements to shareholders, which purportedly enabled the Board to provide "effective governance of FedEx's business" and promote "a culture and reputation of the highest ethics, integrity and reliability."

### Board Leadership Structure

The leadership structure of our Board of Directors includes (i) a combined Chairman of the Board and Chief Executive Officer, (ii) independent, active and effective directors of equal importance and rights, who all have the same opportunities and responsibilities in providing vigorous oversight of the effectiveness of management policies, and (iii) a Lead Independent Director. The Chairperson of the Nominating & Governance Committee, who is elected annually by a majority of the independent Board members, serves as the Lead Independent Director. The Board believes that FedEx has been and continues to be well served by having the company's founder, Frederick W. Smith, serve as both Chairman of the Board and Chief Executive Officer. The current Board leadership model, when combined with the composition of the Board, the strong leadership of our independent directors, Board committees and Lead Independent Director, and the

highly effective corporate governance structures and processes already in place, strikes an appropriate balance between consistent leadership and independent oversight of FedEx's business and affairs.

The Board believes that FedEx's Corporate Governance Guidelines help ensure that strong and independent directors will continue to play the central oversight role necessary to maintain FedEx's commitment to the highest quality corporate governance. Pursuant to our governance principles and established practices:

● **_Executive Sessions._** Non-management Board members meet at regularly scheduled executive sessions without management present in conjunction with each in-person Board meeting. The Lead Independent Director conducts these meetings. In addition, the Lead Independent Director may call such meetings of the non-management Board members as he or she deems necessary or appropriate, may also be designated to preside at any Board or stockholder meeting and presides at all Board meetings at which the Chairman of the Board and Chief Executive Officer is not present.

● **_Agenda Items/Information Requests._** Each Board member may place items on the agenda for Board meetings, raise subjects that are not on the agenda for that meeting or request information that has not otherwise been provided to the Board. Additionally, the Lead Independent Director reviews and approves all Board meeting schedules and agendas and consults with the Chairman of the Board and Chief Executive Officer regarding other information sent to the Board in connection with Board meetings or other Board action.

● **_Interaction With Management._** Consistent with our philosophy of empowering each member of our Board of Directors, each Board member has complete and open access to any member of management and to the chairman of each Board committee for the purpose of discussing any matter related to the work of such committee. The Lead Independent Director also serves as a liaison, but not a buffer, between the Chairman of the Board and Chief Executive Officer and independent Board members.

● **_Interaction With Stockholders._** If any of our major stockholders asks to speak with any Board member on a matter related to FedEx, we encourage that director to make himself or herself available and will facilitate such interaction. Additionally, the Lead Independent Director is available to communicate with stockholders, as appropriate, if requested by such stockholders.

● **_Special Board Meetings._** Special meetings of the Board can be called by the Chairman of the Board and Chief Executive Officer or at the request of two or more directors.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                                    17

- ***Retention of Independent Advisors.***  The Board and each Board committee have the authority to retain independent legal, financial and other advisors as they deem appropriate.

- ***Annual Review.***  Our directors evaluate the Board's processes on an annual basis to ensure, among other things, that its leadership structure remains effective, that Board and committee meetings are conducted in a manner that promotes candid and constructive dialog and that sufficient time has been allocated for such meetings.

48.     The Company described the Board's "Risk Oversight" function as follows:

The Board of Directors' role in risk oversight at FedEx is consistent with the company's leadership structure, with management having day-to-day responsibility for assessing and managing the company's risk exposure and the Board and its committees providing oversight in connection with those efforts, with particular focus on ensuring that FedEx's risk management practices are adequate and regularly reviewing the most significant risks facing the company.  The Board performs its risk oversight role by using several different levels of review.  Each Board meeting begins with a strategic overview by the Chairman of the Board, President and Chief Executive Officer that describes the most significant issues, including risks, affecting the company, and also includes business updates from each reporting segment CEO.  In addition, at least annually, the Board reviews in detail the business and operations of each of the company's reporting segments, including the primary risks associated with that segment.

The Board reviews the risks associated with the company's financial forecasts and annual business plan.  These risks are identified and managed in connection with the company's robust enterprise risk management ("ERM") process.  Our ERM process provides the enterprise with a common framework and terminology to ensure consistency in identification, reporting and management of key risks.  The ERM process is embedded in our strategic financial planning process, which ensures explicit consideration of risks that affect the underlying assumptions of the strategic plans and provides a platform to facilitate integration of risk information in business decision-making.

The Board has delegated to each of its committees responsibility for the oversight of specific risks that fall within the committee's areas of responsibility.  For example:

- The Audit Committee reviews and discusses with management the company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures.

- The Compensation Committee reviews and discusses with management the relationship between the

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    18

company's compensation policies and practices and the
company's risk management, including the extent to which
those policies and practices create or decrease risks for the
company.

- The Information Technology Oversight Committee
reviews and discusses with management the quality and
effectiveness of the company's information technology
systems and processes, including the extent to which those
systems and processes create or decrease information
security and other risks for the company.

- The Nominating & Governance Committee reviews
and discusses with management the implementation and
effectiveness of the company's compliance and ethics
programs, including the Code of Business Conduct and
Ethics.

In addition, the Audit Committee is responsible for reviewing and
discussing with management the guidelines and policies that govern the
processes by which the company assesses and manages its exposure to all
risk, including our ERM process.  The ERM process culminates in an
annual presentation to the Audit Committee on the key enterprise risks
facing FedEx.

49.     According to the Company's Proxies, the Board's Audit Committee is responsible

for the policies that govern the processes by which the Company assess and manages it exposure

to all risk, including the "ERM" or Enterprise Risk Management process.  These and other duties

are further reflected in the description of the Audit Committee Charter on the Company's

website and public filings, which states in pertinent part:

### Audit Committee Charter

Purpose
Membership
Functions, Powers and Responsibilities

### Purpose

The purpose of the Audit Committee is to:

- Oversee the independent auditor's qualifications, independence and
performance, and preapprove all audit and allowable non-audit
services to be provided by the independent auditor;

- Assist Board oversight of (i) the integrity of the Company's
financial statements and other financial information; (ii) the

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    19

effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting; (iii) the performance of the Company's internal auditors; and (iv) the Company's compliance with legal and regulatory requirements . . . .

* * * *

**Functions, Powers and Responsibilities**

The Audit Committee shall: . . . .

Internal Control Structure

14. Review, and discuss with management, the independent auditor and the senior internal audit executive, the adequacy and effectiveness of the Company's (i) financial reporting procedures and (ii) internal control structure, including its disclosure controls and procedures and internal control over financial reporting (including any material weaknesses, significant deficiencies or significant changes to internal controls).

15. Review and discuss with management, the independent auditor and the senior internal audit executive the Company's annual internal control report and the independent auditor's attestation to such report.

16. Periodically receive reports from and consult with the Information Technology Oversight Committee of the Board of Directors regarding IT systems and processes that relate to or affect the Company's internal control systems.

Risk Assessment and Risk Management

17. Review and discuss with management and the Board of Directors (i) the guidelines and policies that govern the processes by which the Company assesses and manages its exposure to risk and (ii) the Company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures. . . .

Other . . . .

23. Discuss with the Company's General Counsel or his or her designees any legal matters that may have a material impact on the Company's financial statements or compliance policies relating to accounting or auditing matters. . . .
28. Report regularly to the Board of Directors on matters within the scope of the Committee, as well as any special issues that merit the attention of the Board.

29. Perform such other duties required by law or necessary or appropriate to oversee the integrity of the Company's accounting and financial

reporting practices, or as the Board of Directors may from time to time direct.

50.     According to the Company's Proxies, the Board's Nominating & Governance Committee was responsible for the implementation and effectiveness of the Company's compliance and ethics programs, including the Code of Business Conduct and Ethics.  These and other duties were also reflected in the description of the Nominating & Governance Committee Charter on the Company's website and public filings, which states in pertinent part:

### Nominating & Governance Committee Charter

Purposes
Membership and Subcommittees
Functions, Powers and Responsibilities

### Purpose

The purpose of the Nominating & Governance Committee is to:

- Identify individuals qualified to become Board members, consistent with criteria approved by the Board of Directors;

- Assist the Board in determining the size, structure, composition, processes and practices of the Board and its Committees and assessing director independence and qualification;

- Oversee the Board and executive management performance evaluation processes and monitor the effectiveness of the Board and its Committees;

- Assist the Board in management succession planning; and

- Assist the Board in enhancing (i) the quality of the Company's corporate governance, as reflected in the Company's Corporate Governance Guidelines; and (ii) the effectiveness of the Company's compliance and ethics programs, as reflected in the Company's Code of Business Conduct and Ethics.

* * * *

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**          21

**Functions, Powers and Responsibilities**

The Nominating & Governance Committee shall:

*Board of Directors and Committees*

1. Annually review with the Board of Directors the criteria, including any minimum qualifications and any necessary qualities or skills, for Board membership, which are set forth in the Company's Corporate Governance Guidelines.

2. Identify, evaluate and recruit individuals qualified for Board membership.

3. Periodically review the procedures to be followed by the Company's stockholders in recommending prospective director nominees, which are set forth in the Company's Corporate Governance Guidelines.

4. Consider director nominees proposed by the Company's stockholders.

5. Recommend to the Board director nominees to be proposed for election at the annual meeting of stockholders or to be elected by the Board to fill vacancies or newly-created directorships.

6. Recommend to the Board of Directors nominees for appointment, including a Chairperson, to each committee of the Board.

7. Review and make recommendations to the Board of Directors with respect to the size, structure, composition, processes and practices of the Board and the Board committees.

8. Review each mandatory offer of resignation by a Board member and recommend an appropriate course of action to the Board of Directors.

*Director Independence and Qualification*

9. Periodically review the Company's standards of director independence and recommend any proposed changes to the Board of Directors for approval.

10. In accordance with the Company's standards of director independence and the applicable independence and qualification requirements of the New York Stock Exchange, the Securities Exchange Act of 1934, and any other applicable law, assess and make recommendations to the Board of Directors with respect to each Board member's independence and qualification (e.g., financial expertise of Audit Committee members). . . .

*Corporate Governance Guidelines*

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                     22

16. Periodically review the Company's Corporate Governance Guidelines and recommend any proposed changes to the Board of Directors for approval.

*Compliance and Ethics*

17. Periodically review the Company's Code of Business Conduct and Ethics and recommend any proposed changes to the Board of Directors for approval.

18. Oversee and periodically discuss with the Company's General Counsel or his or her designees the implementation and effectiveness of the Company's compliance and ethics programs, including the Company's Code of Business Conduct and Ethics.

19. In consultation with the Audit Committee, monitor the Company's compliance with legal and ethical requirements.

20. Review and make recommendations to the Board of Directors regarding potential waivers of the Code of Business Conduct and Ethics involving Board members or executive management. . . .

*Other*

24. Review and make recommendations to the Board of Directors with respect to any stockholder proposal. To the extent that a shareholder proposal relates to a matter that is overseen by another committee (e.g., executive compensation), then the input of such other committee shall be solicited.

25. Annually review and reassess the adequacy of this charter and recommend any proposed changes to the Board of Directors for approval.

26. Report regularly to the Board of Directors on matters within the scope of the Committee, as well as any special issues that merit the attention of the Board.

27. Perform such other duties required by law or otherwise as are necessary or appropriate to ensure the effective functioning of the Board of Directors, high quality corporate governance and effective compliance and ethics programs, or as the Board of Directors may from time to time direct.

51.     Based on these repeated representations, FedEx's shareholders and the public were left with the clear impression that the Company's operations were closely monitored by a vigilant and independent Board, and that members of the Board's Audit and Nominating &

Governance Committees were specifically acting to ensure that the Company was complying with all laws pertinent to its business and reducing the risks of non-compliance given the potentially devastating impacts on FedEx's business and reputation.  That picture, however, was only an illusion.

**C.    The Criminal Charges in the Superseding Indictment Reveal FedEx's Knowing And Illegal Participation In Distributing, and Laundering Money From the Sale of, Prescription Drugs By Internet Retailers**

52.    On July 17, 2014, after a 9-year investigation of FedEx, the United States Attorney for the Northern District of California, Melinda Haag, Drug Enforcement Administration (DEA) Special Agent in Charge Jay Fitzpatrick, and Food and Drug Administration (FDA) Acting Director of the Office of Criminal Investigations Philip J. Walsky issued a joint release stating that a federal grand jury in San Francisco had indicted FedEx Corporation, FedEx Express, Inc., and FedEx Corporate Services, Inc. with conspiracies to traffic in controlled substances and misbranded prescription drugs for illegal Internet pharmacies.

53.    On August 15, 2014, the Justice Department filed the Superseding Indictment, including the existing facts, allegations and charges as the original indictment and adding three additional charges for conspiracy to launder money.

54.    According to the Superseding Indictment, beginning in approximately 1998, Internet pharmacies began offering consumers prescription drugs, including controlled substances, based on the provision of information over the Internet.  While some Internet pharmacies were managed by well-known pharmacy chains that required valid prescriptions and visits to the patient's personal physician, others failed to require a prescription before filling orders for controlled substances and prescription drugs.  Rather, these Internet pharmacies filled orders based solely on the completion of an online questionnaire, without a physical examination, diagnosis, or face-to-face meeting with a physician.  According to the Superseding Indictment, such practices violated federal and state laws governing the distribution of prescription drugs and controlled substances.

55.     The Superseding Indictment also alleged that, from at least as early as 2004, DEA, FDA and members of Congress and their staff informed FedEx on at least six different occasions that illegal Internet pharmacies were using its shipping services to distribute controlled substances and prescription drugs in violation of the Controlled Substances Act (CSA), Food, Drug and Cosmetic Act (FDCA), and numerous state laws.  Additional charges brought as part of the Superseding Indictment allege that, beginning in 2000, FedEx "knowingly and intentionally" laundered shipping payments derived from illegal drug sales, in violation of the Money Laundering Control Act (MLCA).

56.     However, rather than immediately act to curb the practice, in 2004, FedEx established an Online Pharmacy Credit Policy requiring that all online pharmacy shippers be approved by the Credit Department prior to opening a new account *in order to ensure that FedEx continued to be paid for its distribution services*.  Rather than being concerned about government warnings that FedEx was participating in the distribution of illegal drugs, FedEx and its Board were instead concerned that many of the Internet pharmacies were being shut down by the government without warning, leaving a large balance owed to FedEx.

57.     The FedEx Senior Vice President of Corporate Security testified before congressional committees on the illegal distribution of prescription drugs on two occasions, in July 2004 and December 2005.  The FedEx Senior Vice President testified that "[t]hese so-called Internet pharmacies are virtual entities and cannot be linked by us to a shipping site, unless law enforcement makes that association for us."  However, this flies in the face of the 2004 Online Pharmacy Credit policy, which was applicable to all online pharmacy shippers, and required approval before opening new accounts.  According to the Superseding Indictment, in July 2004, FedEx's "Credit Department had a list of more than 200 FedEx accounts that FedEx employees had identified as Internet pharmacies and were able to link to a shipping site.  In December of 2005, there more than 250 FedEx accounts on FedEx list of Internet pharmacies that FedEx employees were able to link to shipping sites."

58.     According to the Superseding Indictment, FedEx also established a sales policy in which all online pharmacies were assigned to a "catchall" classification to protect the

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                                    25

1 | commission-based compensation of its sales professionals from the volatility caused by online

2 | pharmacies moving shipping locations often to avoid detection by the DEA.

3 |       59.      According to the Superseding Indictment, as early as 2004, FedEx knew that it

4 | was delivering drugs to dealers and addicts.  FedEx's couriers in Kentucky, Tennessee, and

5 | Virginia expressed safety concerns that were circulated to FedEx senior management, including

6 | that FedEx trucks were stopped on the road by online pharmacy customers demanding packages

7 | of pills, that the delivery address was a parking lot, school, or vacant home where several car

8 | loads of people were waiting for the FedEx driver to arrive with their drugs, that customers were

9 | jumping on the FedEx trucks and demanding online pharmacy packages, and that FedEx drivers

10 | were threatened if they insisted on delivering packages to the addresses instead of giving the

11 | packages to customers who demanded them.  In response to these concerns, FedEx adopted a

12 | procedure whereby Internet pharmacy packages from problematic shippers were held for pick up

13 | at specific stations, rather than delivered to the recipient's address.

14 |       60.      According to the Superseding Indictment, FedEx employees were aware that

15 | online pharmacy customers were shipping drugs to drug addicts who later died from overdoses

16 | after receiving packages delivered by FedEx.  For example, an internal memorandum drafted by

17 | FedEx's Senior Manager of Worldwide Revenue Operations and sent to the FedEx Vice

18 | President of Worldwide Revenue Operations and Managing Director of Security stated, "Many

19 | online pharmacy customers have been closed by the federal government due to fraud and illegal

20 | sales of controlled pharmaceutical products.  In a recent case, a teenager died after being illegally

21 | supplied with a controlled drug that was delivered by FedEx."

22 |       61.      Additionally, the Superseding Indictment alleges that FedEx employees discussed

23 | one customer, well known to FedEx employees for receiving multiple packages from online

24 | pharmacies, who was found dead from a drug overdose one day after picking up an online

25 | pharmacy delivery from a FedEx station.  In total, the Superseding Indictment alleges that FedEx

26 | delivered controlled substances and prescription drugs from illicit online pharmacies to

27 | individuals who subsequently died or accidentally caused the death of others, "including but not

28

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**          26

1   limited to on or about: August 6, 2002, November 8, 2005, February 24, 2006, March 16, 2006,

2   and March 20, 2009."

3         62.    FedEx is charged in the Superseding Indictment with conspiring with two

4   separate but related Internet pharmacy organizations: the Chhabra-Smoley Organization, from

5   2000 through 2008, and Superior Drugs, from 2002 through 2010.  In each case, FedEx is

6   alleged to have knowingly and intentionally conspired to distribute controlled substances and

7   prescription drugs, including Phendimetrazine, Ambien, Phentermine, Diazepam, and

8   Alprazolam to customers who had no legitimate medical need for them based on invalid

9   prescriptions issued by doctors who were acting outside the usual course of professional practice.

10        63.    Additional charges alleged FedEx knowingly and intentionally conspired to

11   launder money by accepting payments from the Chhabra-Smoley Organization and Superior

12   Drugs, despite FedEx knowing that the payments "represented proceeds of the sale of controlled

13   substances and prescription drugs based on invalid prescriptions that were issued outside the

14   usual course of professional practice and not for a legitimate medical purpose."  The Superseding

15   Indictment charges that FedEx conspired with these organizations to violate the CSA, 21 U.S.C.

16   §§ 841, 846, MLCA 18 U.S.C. § 1956 and the FDCA, 21 U.S.C. §§ 331, *et seq.*

17        64.    According to the Superseding Indictment, FedEx began delivering controlled

18   substances and prescription drugs for Internet pharmacies run by Vincent Chhabra, including

19   RxNetwork and USA Prescription, in 2000. When Chhabra was arrested in December of 2003

20   for illegally distributing controlled substances based on a doctor's review of an on-line

21   questionnaire, Robert Smoley took over the organization and continued the illegal distribution of

22   controlled substances and prescription drugs through FedEx.

23        65.    According to the Superseding Indictment, FedEx began delivering controlled

24   substances and prescription drugs for Superior Drugs in 2002.  FedEx's employees knew that

25   Superior Drugs filled orders for online pharmacies that sold controlled substances and

26   prescription drugs to consumers without the need for a face-to-face meeting with, or physical

27   examination or laboratory tests by, a physician.

28

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**       27

66.     According to the Superseding Indictment, FedEx's employees knew that online pharmacies and fulfillment pharmacies affiliated with both the Chhabra-Smoley organization and Superior Drugs were closed down by state and federal law enforcement agencies and that their owners, operators, pharmacists, and doctors were indicted, arrested and convicted of illegally distributing drugs.  Nevertheless, FedEx continued to deliver controlled substances and prescription drugs for the Chhabra-Smoley organization and Superior Drugs.

67.     According to the Superseding Indictment, FedEx "knew" that controlled substances were distributed by the Chhabra-Smoley Organization and Superior "without regard to the age of the buyers and were a likely means by which underage persons obtained controlled substances absent the supervision of an attending physician."  According to the Superseding Indictment, FedEx had an "adult-signature" service that it required its alcohol shippers to use in order to complete alcohol purchases.  However, FedEx did not require the illegal pharmacies to use that same service.  Even when the Internet pharmacies voluntarily used this service, "FedEx allowed packages to be re-routed at the direction of the customer or left at a third-party vendor. FedEx's employees knew that underage customers could use these services to avoid the adult-signature requirement."

68.     The added charges for money laundering allege that FedEx conspired with illegal pharmacies to "knowingly and intentionally" launder more than $630,000 in shipping payments that were derived from illicit drug sales via FedEx.  According to the Superseding Indictment, FedEx allegedly received the payments despite knowing the payments "represented proceeds of the sale of controlled substances and prescription drugs based on invalid prescriptions that were issued outside the usual course of professional practice and not for a legitimate medical purpose."  The Superseding Indictment also alleges that FedEx conspired to launder money by collecting payments from sales of illegal drugs and then forwarding the payments directly to the illegal pharmacies.

69.     If convicted, FedEx reportedly faces a maximum sentence of 5 years of probation, and a fine of approximately $1.6 billion, or twice the gross gain derived from the offense, alleged in the Superseding Indictment to be at least $820 million.  FedEx is also liable for restitution to

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    28

1    victims of the crime, as well as forfeiture of the gross proceeds of the offense and any facilitating

2    property.

3        70.    The Individual Defendants do not believe that the Company did anything wrong

4    nor that the Company's practices need to change.  To the contrary, the Company's management

5    issued the following statement addressing the original criminal Indictment:

6
            FedEx is innocent of the charges brought today by the Department
7        of Justice. We will plead not guilty. We will defend against this attack on
         the integrity and good name of FedEx and its employees.
8
            FedEx has a 42-year history of close cooperation with law
9        enforcement agencies. We're proud to say that we have partnered with the
         FBI, the Department of Homeland Security, DEA, and other federal, state
10       and local law enforcement teams around the world to help stop illegal drug
         activity and bring criminals to justice. These efforts include providing
11       assistance to the DEA in combatting rogue internet pharmacies. We have
         repeatedly requested that the government provide us a list of online
12       pharmacies engaging in illegal activity. Whenever DEA provides us a list
         of pharmacies engaging in illegal activity, we will turn off shipping for
13       those companies immediately. So far the government has declined to
         provide such a list.
14
15          FedEx transports more than 10 million packages a day. The
         privacy of our customers is essential to the core of our business. This
16       privacy is now at risk, based on the charges by the Department of Justice
         related to the transportation of prescription medications.
17
18          We want to be clear what's at stake here: the government is
         suggesting that FedEx assume criminal responsibility for the legality of
19       the contents of the millions of packages that we pick up and deliver every
         day. We are a transportation company – we are not law enforcement. We
20       have no interest in violating the privacy of our customers. We continue to
         stand ready and willing to support and assist law enforcement. We cannot,
21       however, do the job of law enforcement ourselves.

22

23                                     **VI.**

24    **THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE FALSE AND**

25                    **MISLEADING PROXY STATEMENTS**

26        71.    **THE 2012 PROXY STATEMENT.**  On August 13, 2012, Defendants Smith,

27    Barksdale, Edwardson, Jackson, Loranger, Loveman, Martin, Ramo, Schwab, Steiner and Walsh

28    caused FedEx to issue its 2012 Proxy Statement, which was filed with the SEC, posted to

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    29

1   FedEx's website, and mailed to FedEx shareholders.  In it, such defendants and the Company

2   urged FedEx shareholders to follow the Company's recommendations with respect to the matters

3   submitted for shareholder approval at the Company's 2012 Annual Meeting, which was held on

4   September 24, 2012 at FedEx's offices in Memphis, Tennessee.

5       72.    Among the items which shareholders were asked to vote on at the 2012 Annual

6   Meeting, the Proxy urged shareholders to vote in favor of the re-election of Defendants Smith,

7   Barksdale, Edwardson, Jackson, Loranger, Loveman, Martin, Ramo, Schwab, Steiner and Walsh

8   as directors of the Company; and (2) vote against a shareholder proposal which sought to require

9   a policy that the Board's Chairman be an independent director who has not previously served as

10  an executive officer of FedEx, since Defendant Smith had held the positions of Chairman and

11  CEO since 1977 (and still does) and, according to the proposal, exerted a dominant influence

12  over the Board.  With respect to the re-election of Defendants Smith, Barksdale, Edwardson,

13  Jackson, Loranger, Loveman, Martin, Ramo, Schwab, Steiner and Walsh as directors, the Proxy

14  urged shareholders to re-elect such directors because, among other things, such directors were

15  allegedly independent, competent, and had in the past and continued to provide diligent and

16  effective oversight of management and the risks facing the Company.  The Proxy also noted

17  these factors as a reason why the Company urged shareholders to vote against the shareholder

18  proposal which sought to separate the roles of Chairman and CEO.

19      73.    Based on the false statements and material omissions in the 2012 Proxy, a

20  majority of FedEx's shareholders voted in favor of the Company's recommended position on

21  these items.  The relevant directors were re-elected and the shareholder proposal regarding

22  separation of the roles of Chairman and CEO was defeated.

23      74.    Specifically, the 2012 Proxy contained the following representations regarding the

24  Board's crucial role in risk oversight of management, which were drafted, reviewed, and/or

25  approved by Defendants Smith, Barksdale, Edwardson, Jackson, Loranger, Loveman, Martin,

26  Ramo, Schwab, Steiner and Walsh:

27

28

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    30

**Board Risk Oversight**

The Board of Directors' role in risk oversight at FedEx is consistent with the company's leadership structure, with management having day-to-day responsibility for assessing and managing the company's risk exposure and the Board and its committees providing oversight in connection with those efforts, with particular focus on ensuring that FedEx's risk management practices are adequate and regularly reviewing the most significant risks facing the company. The Board performs its risk oversight role by using several different levels of review. Each Board meeting begins with a strategic overview by the Chairman of the Board, President and Chief Executive Officer that describes the most significant issues, including risks, affecting the company, and also includes business updates from each reporting segment CEO. In addition, at least annually, the Board reviews in detail the business and operations of each of the company's reporting segments, including the primary risks associated with that segment.

The Board reviews the risks associated with the company's financial forecasts and annual business plan. These risks are identified and managed in connection with the company's robust enterprise risk management ("ERM") process. Our ERM process provides the enterprise with a common framework and terminology to ensure consistency in identification, reporting and management of key risks. The ERM process is embedded in our strategic financial planning process, which ensures explicit consideration of risks that affect the underlying assumptions of the strategic plans and provides a platform to facilitate integration of risk information in business decision-making.

The Board has delegated to each of its committees responsibility for the oversight of specific risks that fall within the committee's areas of responsibility. For example:

• The Audit Committee reviews and discusses with management the company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures.

• The Compensation Committee reviews and discusses with management the relationship between the company's compensation policies and practices and the company's risk management, including the extent to which those policies and practices create or decrease risks for the company.

• The Information Technology Oversight Committee reviews and discusses with management the quality and effectiveness of the company's information technology systems and processes, including the extent to which those systems and processes create or decrease information security and other risks for the company.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    31

• The Nominating & Governance Committee reviews and discusses with management the implementation and effectiveness of the company's compliance and ethics programs, including the Code of Business Conduct and Ethics.

In addition, the Audit Committee is responsible for reviewing and discussing with management the guidelines and policies that govern the processes by which the company assesses and manages its exposure to all risk, including our ERM process. The ERM process culminates in an annual presentation to the Audit Committee on the key enterprise risks facing FedEx.

75. The 2012 Proxy also contained a shareholder proposal recommending that the Board adopt a policy that the Board's Chairman be an independent director who has not previously served as an executive officer of FedEx. Again, one of the main purposes of this proposal was to increase Board oversight of management and risk at FedEx, since Smith is admittedly not independent. The proposal stated, in pertinent part:

**PROPOSAL 4 — STOCKHOLDER PROPOSAL: INDEPENDENT BOARD CHAIRMAN**

*FedEx is not responsible for the content of this stockholder proposal or supporting statement.*

FedEx has been notified that the International Brotherhood of Teamsters General Fund, 25 Louisiana Avenue, N.W., Washington, D.C. 20001, the beneficial owner of 176 shares of FedEx common stock, intends to present the following proposal for consideration at the annual meeting:

"**RESOLVED:** That shareholders of FedEx Corporation ("FedEx" or "Company"), ask the Board of Directors to adopt a policy that the Board's chairman be an independent director, as defined by the rules of the New York Stock Exchange, who has not previously served as an executive officer of FedEx. The policy should be implemented so as not to violate any contractual obligation and should specify: (a) how to select a new independent chairman if a current chairman ceases to be independent during the time between annual meetings of shareholders; and, (b) that compliance with the policy is excused if no independent director is available and willing to serve as chairman.

**SUPPORTING STATEMENT:** We believe that a Board of Directors is less likely to provide rigorous independent oversight of management if the Chairman is the CEO, as is the case with FedEx.

FedEx founder Frederick W. Smith has held the positions of Chairman and CEO since 1977. We believe this leadership structure has allowed Smith to exert a dominant influence over the Board, impeding its ability to ensure that management acts strictly in FedEx's best interests.

FedEx's Board does not have a lead director, and we believe the Board's composition exacerbates the need for an independent Chairman. Specifically:

      •      Five members of the 12-member Board will have served together as FedEx directors for over a decade, including the Chair of the Nominating and Governance Committee and a member of that committee who is a former FedEx Express executive.

      •      FedEx discloses transactions, relationships and arrangements that could potentially compromise the independence of four non-management directors, including the Chairs of the Audit and Compensation Committees.

      •      Three non-management directors, including the Chair of the Compensation Committee, are CEOs of large public companies and another director serves on four other public company boards in addition to her regular employment.

      (FedEx 2011 Proxy Statement)

We believe that Smith's compensation package raises further concern about the Board's effective independent oversight on behalf of shareholders. Stock options that lack performance hurdles comprised between 43 and 56 percent of Smith's targeted total direct compensation in each of the fiscal years 2008--2011, and he realized approximately $81 million from option exercises over that time period, according to FedEx's 2008--2011 Proxy Statements. In 2011, the Board, using its discretion, awarded Smith an additional bonus of $375,000 in annual incentive compensation even though he was entitled to only $91,592 based on the Company's financial performance. . . .

We urge your support **FOR** this proposal.'"

76.     In response to this proposal, Defendants Smith, Barksdale, Edwardson, Jackson, Loranger, Loveman, Martin, Ramo, Schwab, Steiner and Walsh caused the Company to file a statement in opposition which urged shareholders to vote against the proposal, essentially assuring shareholders that the Board's oversight of management was and had always been robust, that no changes were needed, and that there was no conflict in Smith serving as both Chairman and CEO.  The Company's position stated, in pertinent part:

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**      33

**Board of Directors' Statement in Opposition**

The Board of Directors and its Nominating & Governance Committee have considered this proposal and concluded that its adoption is unnecessary and not in the best interests of our stockholders.

***FedEx and its stockholders are best served by having Mr. Frederick W. Smith, FedEx's founder and Chief Executive Officer, serve as Chairman of the Board of Directors.*** FedEx's Bylaws provide that the Chairman of the Board of Directors shall be the Chief Executive Officer, unless the Board decides otherwise. This approach provides the Board with the necessary flexibility to determine whether the positions should be held by the same person or by separate persons based on the leadership needs of FedEx at any particular time. Adopting a policy to restrict the Board's discretion in selecting the Chairman of the Board, as well as restricting the ability to combine the positions of Chairman and CEO, would deprive the Board of the ability to select the most qualified and appropriate individual to lead the Board as Chairman. The Board has given careful consideration to separating the roles of Chairman and Chief Executive Officer and has determined that FedEx and its stockholders are best served by having Mr. Smith, FedEx's founder, serve as both Chairman of the Board of Directors and Chief Executive Officer. Mr. Smith's combined role as Chairman and Chief Executive Officer promotes unified leadership and direction for the Board and executive management and it allows for a single, clear focus for the chain of command to execute FedEx's strategic initiatives and business plans.

Mr. Smith has served as both Chairman of the Board and Chief Executive Officer of FedEx since 1977. Mr. Smith is the pioneer of the express transportation industry and his record of innovation, achievement and leadership speaks for itself. Under Mr. Smith's leadership, FedEx has become one of the most trusted and respected brands in the world. For eleven consecutive years FedEx has ranked in the top 20 in *FORTUNE* magazine's "World's Most Admired Companies" list, rising to number 6 on the most recent 2012 list. Mr. Smith has been named one of the top 30 chief executives in the world by *Barron's* magazine for five consecutive years. Under Mr. Smith's leadership, FedEx has also experienced strong long-term financial growth and stockholder return. FedEx's compound annual growth rates for revenue, earnings per share and stock price since its initial public offering in 1978 are approximately 18%, 11% and 15%, respectively. The Board of Directors believes that our stockholders have been well served by having Mr. Smith act as both Chairman and Chief Executive Officer.

***FedEx's strong and independent Board of Directors, together with our Lead Independent Director, effectively oversees our management and provides vigorous oversight of FedEx's business and affairs.*** The Board of Directors is composed of independent, active and

effective directors. Over the past three years, we have added several highly qualified, independent directors to the Board, including: Ambassador Susan C. Schwab, former U.S. Trade Representative; David P. Steiner, the CEO of Waste Management; R. Brad Martin, the former CEO of Saks Incorporated; and Joshua Cooper Ramo, Vice Chairman of Kissinger Associates, Inc. Eleven out of our twelve directors standing for reelection meet the independence requirements of the New York Stock Exchange and the Securities and Exchange Commission and the Board's standards for determining director independence. Mr. Smith is the only member of executive management who is also a director.

In addition, the Chairperson of the Nominating & Governance Committee, who is elected annually by a majority of the independent Board members, serves as the Lead Independent Director. The Lead Independent Director presides at all meetings of the Board if the Chairman of the Board and Chief Executive Officer is not present, serves as a liaison between the Chairman of the Board and Chief Executive Officer and independent Board members and is available to communicate with stockholders, as appropriate, if requested by such stockholders.

Requiring that the Chairman of the Board be an independent director is not necessary to ensure that our Board provides independent and effective oversight of FedEx's business and affairs. Such oversight is maintained at FedEx through the composition of our Board, the strong leadership and engagement of our independent directors, Board committees and Lead Independent Director, and our highly effective corporate governance structures and processes already in place.

The Board of Directors and its committees vigorously oversee the effectiveness of management policies and decisions, including the execution of key strategic initiatives. Each of the Board's Audit, Compensation, and Nominating & Governance Committees is composed entirely of independent directors. Consequently, independent directors directly oversee such critical matters as the integrity of FedEx's financial statements, the compensation of executive management, including Mr. Smith's compensation, the selection and evaluation of directors, and the development and implementation of corporate governance programs. The Compensation Committee, together with the other independent directors, conducts an annual performance review of the Chairman and Chief Executive Officer, assessing FedEx's financial and non-financial performance and the quality and effectiveness of Mr. Smith's leadership. In addition, the Nominating & Governance Committee oversees the processes by which Mr. Smith is evaluated.

The Board believes that FedEx's Corporate Governance Guidelines, which are available on the FedEx Web site, help ensure that strong and independent directors will continue to play the central oversight role necessary to maintain FedEx's commitment to the highest quality

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    35

corporate governance. Pursuant to these governance principles, non-management Board members meet at regularly scheduled executive sessions without management present in conjunction with each in-person Board meeting. The Lead Independent Director presides over these meetings. In addition, the Lead Independent Director may call such meetings of the non-management Board members as he or she deems necessary or appropriate and may also be designated by the Chairman of the Board and Chief Executive Officer to preside at any Board or stockholder meeting.

The Lead Independent Director reviews and approves all Board meeting schedules and agendas and consults with the Chairman of the Board and Chief Executive Officer regarding other information sent to the Board in connection with Board meetings or other Board action.

Moreover, consistent with our philosophy of empowering each member of our Board of Directors, each Board member may place items on the agenda for Board meetings or raise subjects that are not on the agenda for that meeting. In addition, each Board member has complete and open access to any member of management and to the chairman of each Board committee for the purpose of discussing any matter related to the work of such committee. Lastly, the Board and each Board committee have the authority to retain independent legal, financial and other advisors as they deem appropriate. See "Corporate Governance Matters — Board Leadership Structure" on page 9 for more information on our governance practices.

***FedEx disagrees with the proponent's assertions in the supporting statement.*** As discussed under the heading "Compensation Discussion and Analysis," a significant portion of FedEx's executive compensation program consists of variable, at-risk components that are directly dependent upon the achievement of pre-established corporate financial goals or stock price appreciation. The proponent takes issue with Mr. Smith's stock option grants and his exercise of previously granted stock options, but neglects to mention that the options he exercised in fiscal years 2008, 2009, 2010 and 2011 were nearing their expiration date (granted in fiscal years 1998 and 1999, 2000, 2001 and 2002, respectively) and that our options yield value if and only if our stock price appreciates, which benefits all investors. Mr. Smith does not receive restricted stock grants. Moreover, Mr. Smith did not receive a base pay increase for fiscal 2013. . . .

In sum, the Board believes that FedEx and its stockholders have been and continue to be well served by having Mr. Smith serve as both Chairman of the Board and Chief Executive Officer. The current leadership model, when combined with the current composition of the Board and the other elements of our governance structure, strikes an appropriate balance between strong and consistent leadership and

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    36

independent and effective oversight of FedEx's business and affairs. This proposal is clearly an attempt by the proponent to advance its own self-interest, which is inconsistent with the best interests of FedEx and its stockholders as a whole. Accordingly, we recommend that you vote against this proposal.

**Vote Required for Approval**

If this proposal is properly presented at the meeting, approval requires the affirmative vote of a majority of the shares present at the meeting, in person or represented by proxy, and entitled to vote.

**YOUR BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "AGAINST" THIS PROPOSAL.**

77.     These statements were false and misleading because, as alleged in more detail herein, the Director Defendants knew that the Board was not exercising effective oversight of management, that Smith and other high-level management had intentionally disregarded government warnings of illegal conduct and overridden the Company's risk management standards and internal controls, and that management was doing so in order to benefit themselves financially to the detriment of the Company.

78.     Based on the false statements in the 2012 Proxy, the directors up for re-election were all elected as directors, and the shareholder proposal was defeated.  Had the true information been revealed or disclosed to shareholders in the Proxy soliciting materials, it would have been material because there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

79.     **THE 2013 PROXY STATEMENT.**  On August 23, 2013, Defendants Smith, Barksdale, Edwardson, Jackson, Loranger, Loveman, Martin, Ramo, Schwab, Steiner and Walsh caused FedEx to issue its 2013 Proxy Statement, which was filed with the SEC, posted to FedEx's website, and mailed to FedEx shareholders.  In it, such defendants and the Company urged FedEx shareholders to follow the Company's recommendations with respect to the matters submitted for shareholder approval at the Company's 2013 Annual Meeting, which was held on September 23, 2013 at FedEx's offices in Memphis, Tennessee.

80.     Among the items which shareholders were asked to vote on at the 2013 Annual Meeting, the Proxy urged shareholders to vote in favor of the re-election of Defendants Smith,

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    37

Barksdale, Edwardson, Jackson, Loranger, Loveman, Martin, Ramo, Schwab, Steiner and Walsh

as directors of the Company; and (2) vote against a shareholder proposal to require a policy that

the Board's Chairman be an independent director who has not previously served as an executive

officer of FedEx.  With respect to the re-election of Defendants Smith, Barksdale, Edwardson,

Jackson, Loranger, Loveman, Martin, Ramo, Schwab, Steiner and Walsh as directors, the Proxy

urged shareholders to re-elect such directors because, among other things, such directors were

allegedly independent, competent, and had in the past and continued to provide diligent and

effective oversight of management and the risks facing the Company.  The Proxy also noted

these factors as a reason why the Company urged shareholders to vote against the shareholder

proposal which sought to separate the roles of Chairman and CEO.

81.     Based on the false statements and material omissions in the 2013 Proxy, a

majority of FedEx's shareholders voted in favor of the Company's recommended position on

these items.  The relevant directors were re-elected and the shareholder proposal regarding

separation of the roles of Chairman and CEO was defeated.

82.     Specifically, the 2013 Proxy contained the following representations regarding the

Board's role in risk oversight of management, which were drafted, reviewed, and/or approved by

Defendants Smith, Barksdale, Edwardson, Jackson, Loranger, Loveman, Martin, Ramo, Schwab,

Steiner and Walsh:

**Board Risk Oversight**

The Board of Directors' role in risk oversight at FedEx is
consistent with the company's leadership structure, with management
having day-to-day responsibility for assessing and managing the
company's risk exposure and the Board and its committees providing
oversight in connection with those efforts, with particular focus on
ensuring that FedEx's risk management practices are adequate and
regularly reviewing the most significant risks facing the company. The
Board performs its risk oversight role by using several different levels of
review. Each Board meeting begins with a strategic overview by the
Chairman of the Board, President and Chief Executive Officer that
describes the most significant issues, including risks, affecting the
company, and also includes business updates from each reporting segment
CEO. In addition, at least annually, the Board reviews in detail the

business and operations of each of the company's reporting segments, including the primary risks associated with that segment.

The Board reviews the risks associated with the company's financial forecasts and annual business plan. These risks are identified and managed in connection with the company's robust enterprise risk management ("ERM") process. Our ERM process provides the enterprise with a common framework and terminology to ensure consistency in identification, reporting and management of key risks. The ERM process is embedded in our strategic financial planning process, which ensures explicit consideration of risks that affect the underlying assumptions of the strategic plans and provides a platform to facilitate integration of risk information in business decision-making.

The Board has delegated to each of its committees responsibility for the oversight of specific risks that fall within the committee's areas of responsibility.  For example:

•       The Audit Committee reviews and discusses with management the company's major financial and other risk exposures and the steps management has taken to monitor and control such exposures.

•       The Compensation Committee reviews and discusses with management the relationship between the company's compensation policies and practices and the company's risk management, including the extent to which those policies and practices create or decrease risks for the company.

•       The Information Technology Oversight Committee reviews and discusses with management the quality and effectiveness of the company's information technology systems and processes, including the extent to which those systems and processes create or decrease information security and other risks for the company.

•       The Nominating & Governance Committee reviews and discusses with management the implementation and effectiveness of the company's compliance and ethics programs, including the Code of Business Conduct and Ethics.

In addition, the Audit Committee is responsible for reviewing and discussing with management the guidelines and policies that govern the processes by which the company assesses and manages its exposure to all risk, including our ERM process. The ERM process culminates in an annual presentation to the Audit Committee on the key enterprise risks facing FedEx.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    39

83. The 2013 Proxy once again contained a shareholder proposal recommending that the Board adopt a policy that the Board's Chairman be an independent director who has not previously served as an executive officer of FedEx. The proposal set forth, in pertinent part:

**PROPOSAL 5 — STOCKHOLDER PROPOSAL: INDEPENDENT BOARD CHAIRMAN**

*FedEx is not responsible for the content of this stockholder proposal or supporting statement.*

FedEx has been notified that the International Brotherhood of Teamsters General Fund, 25 Louisiana Avenue, N.W., Washington, D.C. 20001, the beneficial owner of 176 shares of FedEx common stock, intends to present the following proposal for consideration at the annual meeting:

"**RESOLVED:** The shareholders of FedEx Corporation (the "Company") urge the Board of Directors to adopt a policy that the Board's chairman be an independent director. The policy should be implemented so as not to violate any contractual obligation and should specify: (a) how to select a new independent chairman if a current chairman ceases to be independent during the time between annual meetings of shareholders; and, (b) that compliance with the policy is excused if no independent director is available and willing to serve as chairman.

**SUPPORTING STATEMENT:** We believe that a Board of Directors is less likely to provide rigorous independent oversight of management if the chairman is the CEO, as is the case with FedEx.

FedEx founder Frederick W. Smith has held the positions of chairman and CEO since 1977. We believe this leadership structure has allowed Smith to exert a dominant influence over the Board, impeding its ability to effectively oversee management.

Last year FedEx appointed Shirley Ann Jackson as a lead director, but this is a poor substitute for an independent chairman. Jackson has served on the FedEx board under the CEO's chairmanship for 14 years. She has received some of the lowest votes in support of her nomination to the board in recent years and we believe her commitment to FedEx shareholders is compromised because she serves on too many other corporate boards.

Jackson is a director of four other large public companies, a member of 13 board committees and in four cases she chairs those committees. In addition, Jackson has a full-time job as President of Rensselaer Polytechnic Institute where tax records show she works 70 hours a week.

Jackson also serves in several other civic roles including: the Smithsonian Institute Board of Regents; Council on Foreign Relations Board of Directors; Vice Chair of the U.S. Council on Competitiveness; Trustee of the Brookings Institute; Life Member of the MIT Corporate Board of Trustees; Financial Industry Regulatory Authority Board of Governors; International Security Advisory Board to the United States Secretary of State; Royal Academy of Engineering (UK); President's Council of Advisors on Science and Technology; and, Fellow of the American Academy of Arts and Sciences.

An examination of the Company's 2012 proxy statement raises additional questions about the board's ability to act independently from the CEO/chairman. Five of 12 members have served together for over a decade and five different members have financial ties to FedEx that could potentially compromise their independence. Also, three of the directors are CEOs of large public companies, including one who serves on three other corporate boards as well.

In light of the long tenure and financial ties that raise questions of independence for the vast majority of directors, an independent chairman is critical at FedEx.

We urge your support **FOR** this proposal."

84.      In response to this proposal, Defendants Smith, Barksdale, Edwardson, Jackson, Loranger, Loveman, Martin, Ramo, Schwab, Steiner and Walsh caused the Company to file a statement in opposition which urged shareholders to vote against the proposal, essentially assuring shareholders that the Board's oversight of management was and had always been robust, that no changes were needed, and that there was no conflict in Smith serving as both Chairman and CEO. The Company's position stated:

**Board of Directors' Statement in Opposition**

The Board of Directors and its Nominating & Governance Committee have considered this proposal and concluded that its adoption is unnecessary and not in the best interests of our stockholders.

***FedEx and its stockholders are best served by having Mr. Frederick W. Smith, FedEx's founder and Chief Executive Officer, serve as Chairman of the Board of Directors.*** FedEx's Bylaws provide that the Chairman of the Board of Directors shall be the Chief Executive Officer, unless the Board decides otherwise. This approach provides the Board with the necessary flexibility to determine whether the positions should be held by the same person or by separate persons based on the

leadership needs of FedEx at any particular time. Adopting a policy to restrict the Board's discretion in selecting the Chairman of the Board, as well as restricting the ability to combine the positions of Chairman and CEO, would deprive the Board of the ability to select the most qualified and appropriate individual to lead the Board as Chairman. The Board has given careful consideration to separating the roles of Chairman and Chief Executive Officer and has determined that FedEx and its stockholders are best served by having Mr. Smith, FedEx's founder, serve as both Chairman of the Board of Directors and Chief Executive Officer. Mr. Smith's combined role as Chairman and Chief Executive Officer promotes unified leadership and direction for the Board and executive management and it allows for a single, clear focus for the chain of command to execute FedEx's strategic initiatives and business plans.

Mr. Smith has served as both Chairman of the Board and Chief Executive Officer of FedEx since 1977. Mr. Smith is the pioneer of the express transportation industry and his record of innovation, achievement and leadership speaks for itself. Under Mr. Smith's leadership, FedEx has become one of the most trusted and respected brands in the world. For twelve consecutive years FedEx has ranked in the top 20 in *FORTUNE* magazine's "World's Most Admired Companies" list, ranking number 10 on the most recent 2013 list. Mr. Smith has been named one of the top 30 chief executives in the world by *Barron's* magazine for five consecutive years. Under Mr. Smith's leadership, FedEx has also experienced strong long-term financial growth and stockholder return. FedEx's compound annual growth rates for revenue, earnings per share and stock price since its initial public offering in 1978 are approximately 17%, 9% and 15%, respectively. The Board of Directors believes that our stockholders have been well served by having Mr. Smith act as both Chairman and Chief Executive Officer.

***FedEx's strong and independent Board of Directors, together with our Lead Independent Director, effectively oversees our management and provides vigorous oversight of FedEx's business and affairs.*** The Board of Directors is composed of independent, active and effective directors. Over the past two years, we have added highly qualified, independent directors to the Board in R. Brad Martin, the former CEO of Saks Incorporated, and Joshua Cooper Ramo, Vice Chairman of Kissinger Associates, Inc. Ten out of our eleven directors standing for reelection meet the independence requirements of the New York Stock Exchange and the Securities and Exchange Commission and the Board's standards for determining director independence. Mr. Smith is the only member of executive management who is also a director.

In addition, the Chairperson of the Nominating & Governance Committee, who is elected annually by a majority of the independent Board members, serves as the Lead Independent Director. The Lead Independent Director presides at all meetings of the Board if the Chairman

of the Board and Chief Executive Officer is not present, serves as a liaison between the Chairman of the Board and Chief Executive Officer and independent Board members and is available to communicate with stockholders, as appropriate, if requested by such stockholders.

Dr. Shirley Ann Jackson, our Lead Independent Director, is an exemplary director and the consummate professional. We consider the breadth of her experience — in academia, in government service and as a member of other public company boards — to be a tremendous asset to our company. Her other directorships and commitments have not in any way interfered with her service as an effective and active member of the Board of Directors. The Board of Directors carefully considered Dr. Jackson's other directorships and commitments when determining that the Chairperson of the Nominating & Governance Committee would be the Lead Independent Director and when electing Dr. Jackson as Chairwoman of the Nominating & Governance Committee. The Board determined that Dr. Jackson's time commitments would not impede her ability to effectively discharge her responsibilities, and they have not.

As part of the Board's annual assessment of Committee membership, Mr. David P. Steiner has been selected to serve as Chairman of the Nominating & Governance Committee, and thus as the Lead Independent Director, effective immediately following the 2013 annual meeting of stockholders.

Requiring that the Chairman of the Board be an independent director is not necessary to ensure that our Board provides independent and effective oversight of FedEx's business and affairs. Such oversight is maintained at FedEx through the composition of our Board, the strong leadership and engagement of our independent directors, Board committees and Lead Independent Director, and our highly effective corporate governance structures and processes already in place.

The Board of Directors and its committees vigorously oversee the effectiveness of management policies and decisions, including the execution of key strategic initiatives. Each of the Board's Audit, Compensation, and Nominating & Governance Committees is composed entirely of independent directors. Consequently, independent directors directly oversee such critical matters as the integrity of FedEx's financial statements, the compensation of executive management, including Mr. Smith's compensation, the selection and evaluation of directors, and the development and implementation of corporate governance programs. The Compensation Committee, together with the other independent directors, conducts an annual performance review of the Chairman and Chief Executive Officer, assessing FedEx's financial and non-financial performance and the quality and effectiveness of Mr. Smith's leadership. In addition, the Nominating & Governance Committee oversees the processes by which Mr. Smith is evaluated.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**     43

The Board believes that FedEx's Corporate Governance Guidelines, which are available on the FedEx website, help ensure that strong and independent directors will continue to play the central oversight role necessary to maintain FedEx's commitment to the highest quality corporate governance. Pursuant to these governance principles, non-management Board members meet at regularly scheduled executive sessions without management present in conjunction with each in-person Board meeting. The Lead Independent Director presides over these meetings. In addition, the Lead Independent Director may call such meetings of the non-management Board members as he or she deems necessary or appropriate and may also be designated by the Chairman of the Board and Chief Executive Officer to preside at any Board or stockholder meeting.

The Lead Independent Director reviews and approves all Board meeting schedules and agendas and consults with the Chairman of the Board and Chief Executive Officer regarding other information sent to the Board in connection with Board meetings or other Board action.

Moreover, consistent with our philosophy of empowering each member of our Board of Directors, each Board member may place items on the agenda for Board meetings or raise subjects that are not on the agenda for that meeting. In addition, each Board member has complete and open access to any member of management and to the chairman of each Board committee for the purpose of discussing any matter related to the work of such committee. Lastly, the Board and each Board committee have the authority to retain independent legal, financial and other advisors as they deem appropriate. See "Corporate Governance Matters — Board Leadership Structure" on page 10 for more information on our governance practices.

In sum, the Board believes that FedEx and its stockholders have been and continue to be well served by having Mr. Smith serve as both Chairman of the Board and Chief Executive Officer. The current leadership model, when combined with the current composition of the Board and the other elements of our governance structure, strikes an appropriate balance between strong and consistent leadership and independent and effective oversight of FedEx's business and affairs. This proposal is clearly an attempt by the proponent to advance its own self-interest, which is inconsistent with the best interests of FedEx and its stockholders as a whole. Accordingly, we recommend that you vote against this proposal.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                          44

**Vote Required for Approval**

> If this proposal is properly presented at the meeting, approval requires the affirmative vote of a majority of the shares present at the meeting, in person or represented by proxy, and entitled to vote.

**YOUR BOARD OF DIRECTORS RECOMMENDS THAT YOU VOTE "AGAINST" THIS PROPOSAL.**

85.     These statements were false and misleading because, as alleged in more detail herein, the Director Defendants knew that the Board was not exercising effective oversight of management, that Smith and other high-level management had intentionally disregarded government warnings of illegal conduct and overridden the Company's risk management standards and internal controls, and that management was doing so in order to benefit themselves financially to the detriment of the Company.

86.     Based on the false statements in the 2013 Proxy, the directors up for re-election were all elected as directors, and the shareholder proposal was defeated.  Had the true information been revealed or disclosed to shareholders in the Proxy soliciting materials, it would have been material because there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

87.     The falsity of the statements that the Director Defendants drafted, reviewed, and/or approved for inclusion in the 2012 and 2013 Proxy Statements is further evidenced by the fact that the Director Defendants had received warnings from government regulators as early as 2004 indicating that FedEx was prohibited from the distribution of illegal pharmaceuticals from internet pharmacies, that despite these warnings the conduct had not been stopped, and that the Board's risk oversight of management was materially deficient and inadequate with respect to these activities.  Nonetheless, the Director Defendants approved false representations contained in the 2012 and 2013 Proxies, thereby violating their duty of candor and good faith and violated the federal proxy laws.

88.     Additional specific information about the Director Defendants' knowledge of the falsity of the statements in the 2012 and 2013 Proxy Statements is contained below in the demand futility section, in the relevant Proxy Statements and SEC filings issued during the

1   relevant period, each incorporated by reference, as well as in the Superseding Indictment,

2   attached hereto as Exhibit A.

3   <center>**VII.**</center>

4   <center>**RESPONSIBILITIES OF OFFICERS AND DIRECTORS**</center>

5        89.     The fundamental principle of the corporate law governing FedEx is that that the

6   business and affairs of FedEx are managed by and under the direction of FedEx's Board of

7   Directors.  In exercising its powers, corporate directors are charged with an unyielding fiduciary

8   duty to protect the interests of the corporation and to act in the best interests of the shareholders.

9   The FedEx Board of Directors who are named Defendants in this action owed FedEx the highest

10   fiduciary duties and were obligated to protect and defend the interests of FedEx.

11        90.     The corporate directors of FedEx owed and owe the company a duty of care and a

12   duty of loyalty.  The duty of care includes a duty by each director of FedEx to inform himself or

13   herself, prior to making a business decision, of all material information available to the director

14   and to consider all alternatives.  The more significant the decision, the greater is the requirement

15   to probe and consider alternatives.  In this case, the corporate directors of FedEx knew that the

16   company was increasingly involved in the shipment of illegal pharmaceuticals by internet

17   pharmacies and reliant on such income to help drive FedEx's profits and financial success.  The

18   importance of the business to FedEx, and the fact that government regulators had specifically

19   warned FedEx about the illegality of the practice, placed upon the FedEx directors an obligation

20   to ensure that the policies and procedures to monitory and curb the practice were appropriate.

21   The FedEx directors therefore had a responsibility to ensure that appropriate information and

22   reporting systems were in place, especially in regards to the risks and legal ramifications of

23   FedEx's shipment of illegal pharmaceuticals.  The failure of the FedEx directors to implement

24   such procedures and policies and the failure of the FedEx directors to exercise due diligence and

25   the greatest care in the performance of their responsibilities constituted breaches of their

26   fiduciary duties to the company and its shareholders.

27        91.     Corporate directors also owe a duty of loyalty to the corporation that they serve.

28   That duty of loyalty is a broad and all-encompassing, and it imposes on corporate directors a

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                                    46

special obligation to serve the interests of the corporation above their own interests. The duty of loyalty embodies both an affirmative duty to protect the interests of the corporation and an obligation to refrain from conduct that would injure the corporation and its shareholders in any way. Corporate directors must put the best interests of the corporation and its shareholders above his or her own interest.

92.     In this case, the members of FedEx's Board of Directors put their own interests ahead of that of the company. The decision to push forward with the shipment of illegal pharmaceuticals without adequate safeguards, policies and procedures was made because it increased the personal income of the Defendants, while putting FedEx at substantial risk and exposing FedEx to substantial civil and criminal penalties, fines and settlements. As such, the Defendants violated their duty of loyalty to FedEx.

93.     FedEx's Board members are and at all times were the fiduciaries of FedEx and its shareholders. Their duty was to personally assure themselves that FedEx did not face substantial exposure to civil and criminal penalties, fines and settlements for engaging in illegal and improper conduct in the shipment of illegal pharmaceuticals. Their duty was to personally assure themselves that there were policies and procedures in place to ensure that FedEx monitored and curbed such illegal shipments. The members of FedEx's Board of Directors failed in that duty by choosing to place their own self-interest in maximizing their personal benefit over the best interests of the Company and its shareholders.

94.     The Defendants who are officers of FedEx also had a fiduciary duty to ensure that FedEx conducted itself in a lawful manner and that internal controls, policies and procedures were in place to prevent the company from engaging in the shipment of illegal pharmaceuticals, irrespective of whatever short-term gains could be obtained from such misconduct. Defendant Smith, in particular, as both an officer and director of FedEx, had the highest duty to ensure that FedEx engaged in legal conduct. In this case, the Defendants pushed FedEx into the business, allowing the Company to continue such business to pump its profits and ensure that executives reaped lucrative bonuses and salaries.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    47

95.     Defendants all were involved in the FedEx's decision to ship illegal pharmaceuticals and/or in failing to ensure that adequate processes were in place to protect against the risks to which such business exposed FedEx, including potential liability, fines, penalties and settlements.  Defendants also were and are responsible for the significant reputational harm suffered by FedEx, as well as the potential adverse impact government actions and regulation will have on FedEx as the result of FedEx's misconduct.

## VIII.

## <u>DEMAND FUTILITY ALLEGATIONS</u>

96.     Plaintiff brings this action derivatively in the right of and for the benefit of FedEx to redress injuries suffered and to be suffered by FedEx as a result of the Defendants' breaches of fiduciary duty and gross mismanagement.  Plaintiff and his counsel will adequately and fairly represent the interests of FedEx in enforcing and prosecuting its rights.  Plaintiff incorporates by reference into this section all the foregoing factual allegations, which demonstrate that demand on the Board of Directors is futile.

97.     At the time this action was initially filed, FedEx had 13 directors.  Demand on the Board which existed when this action was first filed would have been a futile and wasteful act since at least 7 of the 13 members of such Board were not disinterested and could not have fairly and impartially evaluated any demand made on the Board of Directors.

98.     Based upon the Defendants' acts and omissions in direct violation of their fiduciary duties of care, good faith, candor, honesty and loyalty, a pre-suit demand on the FedEx Board of Directors to bring the claims asserted in this Complaint is excused as a futile and useless act.  Based on their salaries, bonuses, stock awards and/or director fees, FedEx's Board of Directors personally profited from the wrongdoing alleged in this Complaint.  The Directors had final supervision and oversight over FedEx's business operations, and permitted and/or authorized FedEx to engage in the illegal and improper conduct described above, in violation of their duties of oversight.  The lack of internal controls at FedEx and the push for profitability without regard to risks to the Company resulted in harm to FedEx.

99.     The fact that the Defendants allowed and/or authorized FedEx to enter into and continue to engage in the distribution of illegal pharmaceuticals from internet pharmacies, and allowed and/or authorized years of money laundering during the relevant period, without adequate internal controls and risk management policies, is an abdication of the responsibilities of the Defendants.  As fiduciaries of FedEx, each Defendant had a duty to understand and be aware of FedEx's business operations, in particular those business operations that constituted a major risk to FedEx, and to ensure that the operations were conducted legally.  In this case, the Defendants had a duty to understand that the distribution of illegal pharmaceuticals from internet pharmacies had occurred at FedEx, that government regulators had demanded that such conduct cease, that FedEx was on notice that individuals were overdosing after receiving illegal prescription drugs delivered by FedEx, and that FedEx needed to put in place internal controls, procedures and policies necessary to ensure that this business was monitored and curbed. Additionally, the Defendants had a duty to understand that FedEx was receiving, for years, illicit payments that derived from the sale of illegal prescription drugs delivered by FedEx, and that this conduct constituted illegal money laundering.  In short, the Directors failed to implement internal controls, policies and procedures to prevent FedEx from engaging in illegal and improper conduct.

100.     Plaintiffs have not made any demand on FedEx's Board of Directors to investigate and prosecute the malfeasance alleged herein.  Such a demand is excused in this case because:  (i) making a demand would be a futile and useless act as the majority of FedEx's directors are not able to conduct an independent and objective investigation of the alleged wrongdoing; (ii) the wrongful conduct of defendants is not subject to protection under the business judgment rule; and (iii) the Defendants each face a substantial likelihood of liability for their alleged misconduct, misrepresentations and breaches of duty.  Under such circumstances, the demand requirement is excused since making such a demand on the Board of Directors would be futile.

101.     The acts complained of constitute violations of the fiduciary duties owed by FedEx's officers and directors and are incapable of ratification.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    49

102.     The FedEx Board of Directors cannot be relied upon to reach a truly independent decision whether to commence the demanded action against themselves and the officers responsible for the misconduct alleged in this derivative complaint because, among other things, the Board is currently dominated by the Individual Defendants, who were personally and directly involved in the acts of mismanagement, abuse of control and waste alleged and who each approved the actions complained of, and to whose directives and views the Board has consistently acceded and will continue to accede.

103.     Four of the Defendants (Smith, Barksdale, Jackson and Walsh) have been Directors and committee members since 1999.  Five Defendant Directors (Edwardson, Loranger, Loveman, Schwab and Steiner) joined the FedEx Board and Board-level committees from 2003-2009, during the peak of the alleged criminal misconduct, and when FedEx was put on notice of its criminal misconduct.  The final two Defendant Directors (Martin and Ramo) both joined the FedEx Board and Board-level committees in 2011, after the decade long conspiracy was in full swing.

104.     As discussed above, the Defendants' duties and obligations as Board members and Board-level committee members, as repeatedly represented to shareholders in FedEx Proxies and SEC filings, required Defendants to exercise their fiduciary duties and take actions to prevent harm to FedEx and its shareholders.  Defendants were entrusted by FedEx shareholders as the stewards of FedEx, yet Defendants refused to take action despite reports and various red flags that FedEx was distributing illegal prescription drugs and knowingly laundering money derived from sales of illegal prescription drugs.

105.     During the Defendants' tenure on the FedEx Board and Board-level committees, FedEx was repeatedly warned about its distribution of illegally sold prescription drugs and the resulting deaths of untold individuals.  Despite FedEx's excuses to the public and Congress that it was not able to link illicit sales to customers without assistance from law enforcement agencies, the evidence set forth in the Indictment demonstrates that FedEx possessed the technology and capability to link and track illicit sales to customers.  Defendants, many of whom

served on Board-level committees responsible for these very systems, knew that FedEx was capable of monitoring, curbing or preventing the alleged criminal misconduct, yet did nothing.

106.   As members of the FedEx Board, each Defendant was bound to follow and enforce the FedEx Corporate Governance Guidelines, as discussed above.  For example, and as discussed fully above, according to the Guidelines Defendants had "ultimate responsibility for risk oversight . . . with particular focus on ensuring that the Company's risk management practices are adequate and regularly reviewing the most significant risks facing the Company." Defendants were responsible for "monitoring the Company's compliance with legal and regulatory requirements and overseeing the implementation and effectiveness of the Company's compliance and ethics programs.  The Board has delegated much of this responsibility to the Nominating & Governance Committee [Defendants Barksdale, Jackson, Steiner and Walsh]. . . in consultation with the Audit Committee [Defendants Edwardson, Loveman, Martin and Ramo]."

107.   The FedEx Corporate Governance Guidelines explicitly state that "[e]ach Board member has complete and open access to any member of the Company's management" and that "members of the Company's senior management routinely attend Board meetings and Board committee meetings and, together with other managers, brief the Board and its committees on particular topics."  This is important because the Indictment alleges that FedEx senior management received warnings from federal regulators, warnings from FedEx employees, management and executives, and internal memos detailing FedEx's distribution of illegal prescription drugs that resulted in overdoses and death to customers receiving FedEx deliveries of the illegal prescription drugs.  These are the very reports from management that were elevated, or at the very least should have been elevated, to the Board and Board-level committees that were ultimately responsible, and entrusted by FedEx shareholders, for exercising their fiduciary duties and providing risk oversight.

108.   Defendants' conduct and their steadfast refusal to take accountability following the July and August 2014 Indictments demonstrates that, rather than accepting and exercising their fiduciary duties, Defendants will protect themselves from prosecution by forcing FedEx and

1   its shareholders to defend against a criminal indictment, incur legal expenses, and pay fines and

2   penalties while entering into agreements that shield the Defendants from liability while

3   themselves shouldering none of the burden they have created.  None of the Defendants are in a

4   position to fairly evaluate his or her own misconduct in this case.

5          109.    The participation by the Board in FedEx's conduct prevents it from validly

6   exercising its business judgment in a fair and neutral manner, and renders it incapable of

7   reaching an independent decision whether to accept any demand by Plaintiff to address the

8   wrongs detailed herein.

9          110.    A majority of the directors also received personal and financial benefits while

10   they caused or permitted FedEx to engage in the extensive misconduct detailed in this derivative

11   complaint.  As detailed in the FedEx Proxies issued during the relevant period, the Defendants

12   all received significant monetary, stock, and other forms of financial compensation for serving as

13   Directors and Board-level committee members.  For example, as of August 18, 2014, each

14   FedEx outside Defendant Director was paid an annual retainer of $111,000 for serving on the

15   Board, and paid additional amounts for attending Board and Board committee meetings,

16   including stock consideration.

17   **A.     Demand is Futile as to Defendant Smith**

18          111.    Demand is futile as to Defendant Smith because: (a) he faces a substantial

19   likelihood of liability for his misconduct and breaches of duty, as discussed throughout this

20   Complaint; (b) he abdicated his duty as the CEO, President and Chairman of FedEx; (c) he is

21   admittedly not independent according to the 2014 FedEx Proxy, filed on August 18, 2014; and

22   (d) he was a director at the time of the alleged wrongdoing and further approved the false and

23   misleading Proxy Statements issued by FedEx during the relevant period.

24          112.    While not named specifically in the criminal Superseding Indictment, if

25   Defendant Smith pursued this derivative action it would expose his own longstanding

26   misconduct in the operations of FedEx.

27          113.    Smith cannot render an independent decision to pursue the actions because he is

28   and was a high-ranking offer of FedEx and allowed the various wrongdoings to occur throughout

---

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    52

his tenure as President, CEO and Chairman.  Smith has served as Chairman of the FedEx Board since 1975 and as President and CEO since 1998.  As stated above, Defendant Smith also issued misleading statements and concealed material facts in the 2012 and 2013 Proxy Statements.  In fact, Defendant Smith was required to review and sign-off, approve and authorize most of FedEx's SEC filings during the relevant period.  Defendant Smith therefore faces a substantial likelihood of liability for breaching his fiduciary duties to FedEx shareholders.

114.    Defendant Smith was and is financially interested such that demand is futile.  As of August 2014, Defendant Smith owned approximately 19.5 million ordinary shares of FedEx stock and 1.5 million option shares, amounting to nearly 7.5% of the total outstanding shares at the time.

**B.    Demand is Futile as to Defendant Barksdale**

115.    Demand is futile as to Defendant Barksdale because: (a) he faces a substantial likelihood of liability for his misconduct and breaches of duty, as discussed throughout this Complaint; (b) he abdicated his duty as a Board member, Chairman of the Information Technology Oversight Committee, member of the Nominating & Governance Committee; and (c) he was a director at the time of the alleged wrongdoing and further approved the false and misleading Proxy Statements issued by FedEx during the relevant period.

116.    Defendant Barksdale serves, and served during the relevant time period, as the chairman of the Information Technology Oversight Committee and was a member of the Nominating & Governance Committee.  As discussed above, each of these committees had specific oversight and governance roles that did in fact, or should have, put Barksdale on notice of the alleged wrongdoing in this Complaint.  For example, according to FedEx Proxy Statements (e.g., the 2012 Proxy), the Information Technology Oversight Committee was responsible for, amongst other things as detailed herein, overseeing, reviewing and discussing "with management the quality and effectiveness of the company's information technology systems and processes, including the extent to which those systems and processes create or decrease information security and other risks for the company."  Similarly, according to FedEx Proxy Statements (e.g., the 2012 Proxy), the Nominating & Governance Committee was

responsible for, amongst other things as detailed herein, overseeing, reviewing and discussing "with management the implementation and effectiveness of the company's compliance and ethics programs, including the Code of Business Conduct and Ethics."

117.    While not named specifically in the criminal Superseding Indictment, if Defendant Barksdale pursued this derivative action it would expose his own misconduct as a Director, Chairman of the Information Technology Oversight Committee, and member of the Nominating & Governance Committee.

118.    Defendant Barksdale would have particularized knowledge of the wrongdoing alleged in the Complaint from his previous role as the Chief Operating Officer of FedEx, where under his guidance, FedEx developed the first computer system capable of tracking packages.

119.    Defendant Barksdale was and is financially interested such that demand is futile. As of August 18, 2014, Barksdale owned 53,800 FedEx ordinary shares and 50,030 option shares.  Additionally, during 2014, Barksdale earned over $277,000 in compensation by serving as a FedEx director.

**C.    Demand is Futile as to Defendants Edwardson and Loveman**

120.    Demand is futile as to Defendants Edwardson and Loveman because: (a) they each face a substantial likelihood of liability for their misconduct and breaches of duty, as discussed throughout this Complaint; (b) they abdicated their duties as Board members and as the chairperson and/or members of board-level committees responsible for oversight and governance of the alleged misconduct; and (c) they are interested because they were both directors at the time of the alleged wrongdoing and they each approved the false and misleading Proxy Statements issued by FedEx during the relevant period.

121.    Defendants Edwardson and Loveman both served on the FedEx Audit Committee, and Defendant Edwardson was the Chairperson of the Audit Committee.  As discussed above, the Audit Committee had specific oversight and governance roles that did in fact, or should have, put Defendants Edwardson and Loveman on notice of the alleged wrongdoing in this Complaint. For example, according to FedEx Proxy Statements (e.g., the 2012 Proxy), the Audit Committee was responsible for, amongst other things as detailed herein, overseeing, reviewing and

1  discussing "with management the company's major financial and other risk exposures and the

2  steps that management [w]as tak[ing] to monitor and control such exposures."

3      122.   While not named specifically in the criminal Superseding Indictment, if

4  Defendants Edwardson or Loveman pursued this derivative action it would expose their own

5  misconduct as a Directors and board-level chairpersons and/or committee members of the FedEx

6  Board.

7      123.   Defendant Edwardson was and is financially interested such that demand is futile.

8  As of August 18, 2014, Edwardson owned 18,119 FedEx ordinary shares and 50,030 option

9  shares.  Additionally, during 2014, Edwardson earned over $281,000 in compensation by serving

10  as a FedEx director.

11     124.   Defendant Loveman was and is financially interested such that demand is futile.

12  As of August 18, 2014, Loveman owned 16,854 FedEx ordinary shares and 27,790 option

13  shares.  Additionally, during 2014, Loveman earned over $264,000 in compensation by serving

14  as a FedEx director.

15  **D.  Demand is Futile as to Defendants Jackson and Walsh**

16     125.   Demand is futile as to Defendants Jackson and Walsh because: (a) they each face

17  a substantial likelihood of liability for their misconduct and breaches of duty, as discussed

18  throughout this Complaint; (b) they abdicated their duties as members of the Board and board-

19  level committees responsible for oversight and governance of the alleged misconduct; and (c)

20  they are interested because they were both directors at the time of the alleged wrongdoing and

21  they each approved the false and misleading Proxy Statements issued by FedEx during the

22  relevant period.

23     126.   Defendants Jackson and Walsh both served on the Compensation Committee and

24  the Nominating & Governance Committee.  As discussed above, these committees had specific

25  oversight and governance roles that did in fact, or should have, put Defendants Jackson and

26  Walsh on notice of the alleged wrongdoing in this Complaint.  For example, according to FedEx

27  Proxy Statements (e.g., the 2012 Proxy), the Compensation Committee was responsible for,

28  amongst other things as detailed herein, for overseeing, reviewing and discussing with FedEx

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                    55

management, the "relationship between the company's compensation policies and practices and the company's risk management, including the extent to which those policies and practices create or decrease risks for the company."  Similarly, according to FedEx Proxy Statements (e.g., the 2012 Proxy), the Nominating & Governance Committee was responsible for, amongst other things as detailed herein, overseeing, reviewing and discussing "with management the implementation and effectiveness of the company's compliance and ethics programs, including the Code of Business Conduct and Ethics."

127.    While not named specifically in the criminal Superseding Indictment, if Defendants Jackson or Walsh pursued this derivative action it would expose their own misconduct as a Directors and board-level committee members of the FedEx Board.

128.    Defendant Jackson was and is financially interested such that demand is futile. As of August 18, 2014, Jackson owned 8,111 FedEx ordinary shares and 3,700 option shares. Additionally, during 2014, Jackson earned over $263,000 in compensation by serving as a FedEx director.

129.    Defendant Walsh was and is financially interested such that demand is futile. As of August 18, 2014, Walsh owned 8,500 FedEx ordinary shares and 44,030 option shares. Additionally, during 2014, Walsh earned over $258,000 in compensation by serving as a FedEx director.

**E.    Demand is Futile as to Defendant Loranger**

130.    Demand is futile as to Defendant Loranger because: (a) he faces a substantial likelihood of liability for his misconduct and breaches of duty, as discussed throughout this Complaint; (b) he abdicated his duty as a member of the Board and Compensation Committee, which was responsible for oversight and governance of the alleged misconduct; and (c) he was a director at the time of the alleged wrongdoing and further approved the false and misleading Proxy Statements issued by FedEx during the relevant period.

131.    Defendant Loranger was a member of the Compensation Committee.  As discussed above, the Compensation Committee had specific oversight and governance roles that did in fact, or should have, put Loranger on notice of the alleged wrongdoing in this Complaint.

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                                  56

For example, according to FedEx Proxy Statements (e.g., the 2012 Proxy) the Compensation Committee was responsible for, amongst other things as detailed herein, for overseeing, reviewing and discussing with FedEx management, the "relationship between the company's compensation policies and practices and the company's risk management, including the extent to which those policies and practices create or decrease risks for the company."

132.    While not named specifically in the criminal Superseding Indictment, if Loranger pursued this derivative action it would expose his own misconduct as a Director and member of the Compensation Committee.

133.    Defendant Loranger was and is financially interested such that demand is futile. As of August 18, 2014, Loranger owned 7,800 FedEx ordinary shares through a family trust and owned an additional 38,630 option shares outright. Additionally, during 2014, Loranger earned over $277,000 in compensation by serving as a FedEx director.

**F.    Demand is Futile as to Defendants Martin and Ramo**

134.    Demand is futile as to Defendants Martin and Ramo because: (a) they each face a substantial likelihood of liability for their misconduct and breaches of duty, as discussed throughout this Complaint; (b) they abdicated their duties as members of the Board and board-level committees responsible for oversight and governance; and (c) they are interested because they were both directors at the time of the alleged wrongdoing and they each approved the false and misleading Proxy Statements issued by FedEx during the relevant period.

135.    Defendants Martin and Ramo served on the Audit Committee and the Information Technology Oversight Committee. As discussed above, these committees had specific oversight and governance roles that did in fact, or should have, put Defendants Martin & Ramo on notice of the alleged wrongdoing in this Complaint. For example, according to FedEx Proxy Statements (e.g., the 2012 Proxy), the Audit Committee was responsible for, amongst other things as detailed herein, overseeing, reviewing and discussing "with management the company's major financial and other risk exposures and the steps that management [w]as tak[ing] to monitor and control such exposures." Similarly, according to FedEx Proxy Statements (e.g., the 2012 Proxy), the Information Technology Oversight Committee was

responsible for, amongst other things as detailed herein, overseeing, reviewing and discussing "with management the quality and effectiveness of the company's information technology systems and processes, including the extent to which those systems and processes create or decrease information security and other risks for the company."

136.     While not named specifically in the criminal Superseding Indictment, if Defendants Martin or Ramo pursued this derivative action it would expose their own misconduct as a Directors and board-level committee members of the FedEx Board.

137.     Defendant Martin was and is financially interested such that demand is futile. As of August 18, 2014, Martin owned 56,500 FedEx ordinary shares and 14,390 option shares. Additionally, during 2014, Martin earned over $258,000 in compensation by serving as a FedEx director.

138.     Defendant Ramo was and is financially interested such that demand is futile. As of August 18, 2014, Ramo owned 14,390 FedEx option shares.  Additionally, during 2014, Ramo earned over $258,000 in compensation by serving as a FedEx director.

**G.     Demand is Futile as to Defendant Schwab**

139.     Demand is futile as to Defendant Schwab because: (a) she faces a substantial likelihood of liability for her misconduct and breaches of duty, as discussed throughout this Complaint; (b) she abdicated her duty as a member of the Board, Compensation Committee, and Information Technology Oversight Committee, which were each responsible for oversight and governance; and (c) she was a director at the time of the alleged wrongdoing and approved the false and misleading Proxy Statements issued by FedEx during the relevant period.

140.     Defendant Schwab serves, and served during the relevant time period, on the Compensation Committee and the Information Technology Oversight Committee.  As discussed above, these committees had specific oversight and governance roles that did in fact, or should have, put Defendant Schwab on notice of the alleged wrongdoing in this Complaint.  For example, according to FedEx Proxy Statements (e.g., the 2012 Proxy) the Compensation Committee was responsible for, amongst other things as detailed herein, for overseeing, reviewing and discussing with FedEx management, the "relationship between the company's

compensation policies and practices and the company's risk management, including the extent to which those policies and practices create or decrease risks for the company."  Similarly, according to FedEx Proxy Statements (e.g., the 2012 Proxy), the Information Technology Oversight Committee was responsible for, amongst other things as detailed herein, overseeing, reviewing and discussing "with management the quality and effectiveness of the company's information technology systems and processes, including the extent to which those systems and processes create or decrease information security and other risks for the company."

141.    While not named specifically in the criminal Superseding Indictment, if Defendant Schwab pursued this derivative action it would expose her own misconduct as a Director and member of the Compensation Committee and the Information Technology Oversight Committee.

142.    Defendant Schwab was and is financially interested such that demand is futile. As of August 18, 2014, Schwab owned 3,185 FedEx ordinary shares and 29,830 option shares. Additionally, during 2014, Schwab earned over $258,000 in compensation by serving as a FedEx director.

143.    Additionally, demand is futile as to Defendant Schwab because of her interested role with FedEx, which purchases aircraft, services and equipment from The Boeing Company, for which Schwab serves as a director.

**H.    Demand is Futile as to Defendant Steiner**

144.    Demand is futile as to Defendant Steiner because: (a) he faces a substantial likelihood of liability for his misconduct and breaches of duty, as discussed throughout this Complaint; (b) he abdicated his duty as a Board member and Chairperson of the Nominating & Governance Committee, which was responsible for oversight and governance; and (c) he was a director at the time of the alleged wrongdoing and approved the false and misleading Proxy Statements issued by FedEx during the relevant period.

145.    Defendant Steiner serves, and served during the relevant time period, as the Chairman of the Nominating and Governance Committee.  As discussed above, the Nominating and Governance Committee had specific oversight and governance roles that did in fact, or

1   should have, put Defendant Steiner on notice of the alleged wrongdoing in this Complaint.  For

2   example, according to FedEx Proxy Statements (e.g., the 2012 Proxy), the Nominating &

3   Governance Committee was responsible for, amongst other things as detailed herein, overseeing,

4   reviewing and discussing "with management the implementation and effectiveness of the

5   company's compliance and ethics programs, including the Code of Business Conduct and

6   Ethics."

7       146.    While not named specifically in the criminal Superseding Indictment, if

8   Defendant Steiner pursued this derivative action it would expose his own misconduct as a

9   Director and Chairperson of the Nominating and Governance Committee.

10      147.    Defendant Steiner was and is financially interested such that demand is futile. As

11  of August 18, 2014, Steiner owned 5,000 FedEx ordinary shares and 25,430 option shares.

12  Additionally, during 2014, Steiner earned over $272,000 in compensation by serving as a FedEx

13  director.

14      148.    Additionally, demand is futile as to Defendant Steiner because FedEx makes

15  purchases from Waste Management, Inc., an entity for which Steiner serves as Chief Executive

16  Officer.  This economic relationship impairs the independence of Steiner to consider a demand.

17                              IX.

18                      CAUSES OF ACTION

19                  FIRST CLAIM FOR RELIEF –

20                  BREACH OF FIDUCIARY DUTY

21      149.    Plaintiffs incorporate by reference the allegations set forth above as though fully

22  restated herein.

23      150.    Each of the Defendants sued under this cause of action owed fiduciary duties to

24  FedEx as officers and/or directors of FedEx.  Each of the Defendants breached his or her duty of

25  loyalty, candor and good faith to the company by putting his or her own pecuniary interests

26  above those of the company.  Each of the Defendants who served between 2004 and 2010,

27  namely Defendants Smith, Barksdale, Edwardson, Jackson, Loranger, Loveman, Schwab, Steiner

28  and Walsh, knowingly permitted and/or authorized FedEx to engage in the distribution of illegal

CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT                    60

pharmaceuticals by internet pharmacies, without regard for risk or exposure to the Company.
Each of these Defendants utterly failed to implement any meaningful or effective reporting or
information system or controls in regards to FedEx's distribution of illegal pharmaceuticals by
internet pharmacies, consciously failed to monitor or oversee FedEx's pharmaceutical
distribution business, and knowingly failed to discharge their fiduciary obligations to FedEx.
Considering the nature and risks associated with the distribution of illegal pharmaceuticals by
internet pharmacies, such Defendants abdicated their fiduciary obligations by knowingly
allowing FedEx to continue to participate in this business.

151.   Each of the Defendants also breached his or her duty of loyalty and candor by
concealing FedEx's involvement in the distribution of illegal pharmaceuticals by internet
pharmacies through fraudulent and misleading representations and through the concealment of
material facts.  Each Defendant put his or her own desire to avoid reputational and litigation risk
before the best interests of the Company.

152.   Defendants are also liable for failing to implement and oversee in good faith, and
with loyalty, adequate internal controls sufficient to:  (a) monitor and prevent FedEx's officers,
directors and employees from failing to comply with all applicable legal obligations and
requirements; (b) monitor and prevent FedEx's officers, directors and employees from engaging
in illegal and/or fraudulent misconduct; (c) remain informed as to FedEx's internal controls and,
upon receipt of notice of information of imprudent or illegal practices, to make reasonable
inquiry in connection therewith, and to take steps to correct such conditions or practices; and (d)
promote a corporate climate that emphasized compliance with laws instead of the systemic
violation of applicable legal requirements in the pursuit of illegal gain.

153.   Defendants abused the trust reposed in them by virtue of their positions and
breached their fiduciary duty of loyalty by utterly abdicating their duty of oversight.  As a result
of their sustained and systematic failure to exercise oversight, Defendants caused or allowed
FedEx's business to be conducted in violation of legal requirements and regulations known to
them.

154.    Defendants specifically owed and owe FedEx the highest obligation of good faith and loyalty in the administration of the affairs of FedEx, including to closely monitor operations that pose significant risk to the Company.  As directors and officers of FedEx, the Defendants were and are required to use their abilities to control and manage FedEx in a fair, just and equitable manner in order to ensure that the Company complied with applicable laws, to refrain from abusing their positions of control, and not to favor their own interests at the expense of FedEx and its shareholders.  Defendants violated their fiduciary duties to FedEx, including without limitation their duties of good faith, honesty, candor and loyalty.

155.    Defendants participated in or had knowledge of FedEx's illegal activities and profited thereby, which constitutes an additional breach of the fiduciary duty owed to the company.

156.    By their acts and omissions alleged herein, Defendants, and each of them, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of FedEx in a manner consistent with the best interest of FedEx and its shareholders.

157.    The wrongful conduct particularized herein was not due to an honest error in judgment, but rather to the Defendants' gross mismanagement, bad faith and/or reckless disregard of the rights and interests of FedEx, and it shareholders.  Defendants made the decisions subject to this action for their own pecuniary gain.

158.    As a result of the foregoing, the Defendants have participated in harming FedEx and have breached fiduciary duties owed to FedEx.  Furthermore, the Defendants knowingly aided, encouraged, cooperated and/or participated in, and substantially assisted the other Defendants in the breaches of their fiduciary duties.

159.    As a result of the Defendants' wrongful conduct, FedEx has suffered and continues to suffer economic losses and non-economic losses, all in an amount to be determined according to proof at the time of trial.  FedEx also faces substantial additional damages including, among other things, reputational and other harm that may arise from ongoing civil and criminal investigations in the Northern District of California.

160.    The acts of the Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiffs, derivatively on behalf of FedEx, are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

<div align="center">

**SECOND CLAIM FOR RELIEF –**

**CORPORATE WASTE**

</div>

161.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

162.    As alleged in detail herein, the Defendants had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of FedEx and in the use and preservation of its property and assets, and they had the highest obligation of fair dealing.

163.    Defendants wasted FedEx's corporate assets by paying or approving the payment of executive and/or director compensation based on the illegal conduct described herein.

164.    As a result of the Defendants' wrongful conduct, FedEx has suffered and continues to suffer economic losses and non-economic losses, all in an amount to be determined according to proof at the time of trial.

<div align="center">

**THIRD CLAIM FOR RELIEF –**

**UNJUST ENRICHMENT**

</div>

165.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

166.    The Defendants derived compensation, fees and other benefits from FedEx and were otherwise unjustly enriched for their management of FedEx during the time in which the wrongful practices occurred, to the detriment of FedEx, profited by engaging in the wrongful conduct set forth above, and/or refused to act to ensure that such benefits are returned to the Company.  These benefits should not be held or retained by the Individual Defendants and should be disgorged back to the company.

167.    Defendants' enrichment is directly and causally related to the detriment of FedEx.

168.     These benefits were accepted by Defendants under such circumstances that it would be inequitable for them to be retained without payment.

169.     As alleged above, the Defendants breached their fiduciary duties and/or abused their positions of control at FedEx and therefore Defendants are not justified in retaining the benefits conferred upon them.

## FOURTH CLAIM FOR RELIEF –

## VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT

170.     Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

171.     The Individual Defendants who were directors at the time, issued, caused to be issued, and participated in the issuance of materially false and misleading written statements and material omissions to shareholders that were contained in the Company's 2012 and/or 2013 Proxy Statements.  The Individual Defendants are sued herein for the false statements in both the 2012 and 2013 Proxy Statements due to their review, approval, and participation in the issuance of both proxies.

172.     The 2012 Proxy Statement soliciting materials were materially false and misleading because they falsely stated that the Company's Board of Directors maintained adequate risk oversight over management and failed to disclose to the Company's shareholders material deficiencies in the Board's oversight of management.  By reason of the conduct alleged herein, the Individual Defendants, who caused the issuance of the 2012 Proxy Statement, violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, the Individual Defendants named herein misled and/or deceived the Company's shareholders by falsely portraying material facts concerning the Board's risk oversight of management.  As a result of the false statements and material omissions, shareholders were deceived.  The false statements and material omissions were material because there is a substantial likelihood that a reasonable shareholder would consider the information important in deciding how to vote with respect to the matters contained in the proxy, which were submitted for shareholder approval at the annual meeting.  Among other things, based on the

1  false statements and material omissions contained in the proxy, a majority of shareholders

2  supported the Company's recommendations.

3        173.    The 2013 Proxy Statement soliciting materials were materially false and

4  misleading because they falsely stated that the Company's Board of Directors maintained

5  adequate risk oversight over management and failed to disclose to the Company's shareholders

6  material deficiencies in the Board's oversight of management.  By reason of the conduct alleged

7  herein, the Individual Defendants, who caused the issuance of the 2013 Proxy Statement,

8  violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these

9  Defendants' wrongful conduct, the Individual Defendants named herein misled and/or deceived

10  the Company's shareholders by falsely portraying material facts concerning the Board's risk

11  oversight of management.  As a result of the false statements and material omissions,

12  shareholders were deceived.  The false statements and material omissions were material because

13  there is a substantial likelihood that a reasonable shareholder would consider the information

14  important in deciding how to vote with respect to the matters contained in the proxy, which were

15  submitted for shareholder approval at the annual meeting.  Among other things, based on the

16  false statements and material omissions contained in the proxy, a majority of shareholders

17  supported the Company's recommendations.

18        174.    Plaintiff, on behalf of the Company, thereby seeks relief for damages inflicted

19  upon the Company in connection with the misleading and incomplete proxy materials.  FedEx is

20  entitled to recover damages to compensate the Company for all damages resulting from the

21  Individual Defendants' acts and omissions in violation of Rule 14a-9.   FedEx was subjected to

22  millions of dollars in damages due to the Board's materially deficient oversight of management

23  and the Board's failure to ensure adequate internal controls at FedEx, and is further exposed to

24  hundreds of millions of dollars in damages based on the criminal Superseding Indictment, all of

25  which could have been avoided or mitigated had independent directors been appointed to the

26  Board rather than allowing the faithless directors named as Defendants herein to be re-elected at

27  the 2012 and 2013 annual meetings.  Plaintiff and the Company are also entitled to, and hereby

28

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**       65

seek, injunctive and equitable relief because the conduct of the Individual Defendants named herein interfered with Plaintiff's voting rights and choices at the 2012 and 2013 annual meetings.

175.    This action was timely commenced within three years of the dissemination of the false proxy statements and within one year of the time that Plaintiff discovered or reasonably could have discovered the facts upon which this claim is based.

## X.

## PRAYER FOR RELIEF

Plaintiff, derivatively on behalf of FedEx, prays for judgment as follows:

1.    Awarding damages against all Defendants, jointly and severally, in an amount to be proven at trial;

2.    Awarding a preliminary and/or permanent injunction precluding FedEx and its Board of Directors from continuing to operate FedEx without internal controls for monitoring and curbing FedEx's distribution of illegal pharmaceuticals from internet pharmacies.

3.    Awarding any additional appropriate equitable relief, including any injunctive or declaratory relief necessary to change and/or reform FedEx's corporate governance, policies and culture.

4.    Awarding restitution, disgorgement of all illicit proceeds generated as a result of the wrongful conduct alleged herein, and punitive damages;

5.    Awarding pre-judgment interest, as well as reasonable attorneys' fees and other costs;

6.    Awarding such other relief as this Court may deem just and proper.

Dated: August 21, 2014

**COTCHETT, PITRE & McCARTHY, LLP**

 */s/ Mark C. Molumphy*
MARK C. MOLUMPHY

JOSEPH W. COTCHETT (36324)
jcotchett@cpmlegal.com
NANCY L. FINEMAN (124870)
nfineman@cpmlegal.com
BRYAN M. PAYNE (272971)
bpayne@cpmlegal.com

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**                66

*Attorneys for Plaintiff Christopher Liberty,*
*derivatively on behalf of FedEx Corporation*

## XI.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues that are subject to adjudication by a trier of fact.

Dated: August 21, 2014                 **COTCHETT, PITRE & McCARTHY, LLP**

                                        */s/ Mark C. Molumphy*
                                        MARK C. MOLUMPHY

                                        *Attorneys for Plaintiff Christopher Liberty,*
                                        *derivatively on behalf of FedEx Corporation*

1

### **VERIFICATION**

2    I, Christopher Liberty, declare:

3          I am a plaintiff in this action.  I am also a shareholder of FedEx Corporation and have

4    been a shareholder throughout the entire relevant time period alleged in the Complaint.  I certify

5    under penalty of perjury that I have read and reviewed the Shareholder Derivative Complaint and

6    authorized its filing.  Based upon my and my counsel's investigation, the contents of the

7    Shareholder Derivative Complaint are true to the best of my knowledge, information and belief.

8          Executed this ____ day of August, 2014, in Burlingame, California.

9

10

11          _____

12                CHRISTOPHER LIBERTY

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

Exhibit A

# United States District Court

### FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

### VENUE: SAN FRANCISCO

**FILED**

AUG 1 4 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

V.

FEDEX CORPORATION,
FEDERAL EXPRESS CORPORATION,
(a/k/a FEDEX EXPRESS), and
FEDEX CORPORATE SERVICES, INC.,

DEFENDANT(S).

---

# SUPERSEDING INDICTMENT

VIOLATIONS:
21 U.S.C. § 846 – Conspiracy to Distribute Controlled Substances;
21 U.S.C. § 841 – Distribution of Controlled Substances;
18 U.S.C. § 371 – Conspiracy to Distribute Misbranded Drugs;
21 U.S.C. §§ 331, 333, and 353 – Misbranding Drugs;
18 U.S.C. § 1956 - Conspiracy to Launder Money;
18 U.S.C. §§ 982; 21 U.S.C. § 853 and 28 U.S.C. § 2461 – Forfeiture

---

A true bill.

_Nancy J. Peterson_
Foreman

Filed in open court this _14th_ day of

_August 2014_

_____ Clerk

Bail, $ _No Service_

Nathanael Cousins
United States Magistrate Judge

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☒ INDICTMENT

☒ SUPERSEDING

—— **OFFENSE CHARGED** ——

See Attached

☐ Petty

☐ Minor

☐ Misde-meanor

☒ Felony

PENALTY:  See Attached

—————————————— Name of District Court, and/or Judge/Magistrate Location ——————————————

NORTHERN DISTRICT OF CALIFORNIA

—— **DEFENDANT - U.S** ——

FEDEX CORP., FEDERAL EXPRESS CORP. (A/K/A FEDEX EXPRESS), FEDEX CORPORATE SERVICES, INC. ■

DISTRICT COURT NUMBER  **FILED**

CR 14-0380 CRB

AUG 1 4 2014

**RICHARD W. WIEKING**
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

—— **PROCEEDING** ——

Name of Complaintant Agency, or Person (& Title, if any)

DEA, FDA

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:

☐ U.S. ATTORNEY  ☐ DEFENSE
}
SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
}
MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
}

Name and Office of Person
Furnishing Information on this form  MELINDA HAAG

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)  KIRSTIN M. AULT

—— **DEFENDANT** ——

IS *NOT* IN CUSTODY
Has not been arrested, pending outcome this proceeding
1) ☒ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction
}
☐ Federal  ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

Has detainer  ☐ Yes  If "Yes"
been filed?  ☐ No
}
give date filed

DATE OF
ARREST  Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED
TO U.S. CUSTODY  Month/Day/Year

☐ This report amends AO 257 previously submitted

—— **ADDITIONAL INFORMATION OR COMMENTS** ——

**PROCESS:**

☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT

If Summons, complete following:

☐ Arraignment  ☐ Initial Appearance

Defendant Address:

Bail Amount:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time:  Before Judge:

Comments:

**F I L E L**

AUG 1 4 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## ATTACHMENT TO PENALTY SHEET

**Counts 1 and 13**: 21 U.S.C. § 846 – Conspiracy to Distribute Controlled Substances
Maximum Penalties:

*For conduct prior to April 13, 2009*:

5 years of probation and a fine of up to $1,000,000 or twice the gross gain derived from the offense up to $820,000,000, whichever is greater.

*For conduct after April 13, 2009*:

5 years of probation and a fine of up to $2,500,000 (Schedule III) or $1,000,000 (Schedule IV), or twice the gross gain derived from the offense up to $820,000,000, whichever is greater.

**Counts 2-10 and 14-15**: 21 U.S.C. § 841 – Distribution of Controlled Substances
Maximum Penalties:

Same as for Counts 1 and 12.

**Counts 11 and 16**:  18 U.S.C. § 371 – Conspiracy to Distribute Misbranded Drugs
Maximum Penalties

5 years of probation and a fine of up to $500,000 or twice the gross gain derived from the offense up to $820,000,000, whichever is greater.

**Counts 12 and 17-18**: 18 U.S.C. § 1956 – Conspiracy to Launder Money
Maximum Penalties:

5 years of probation and a fine of up to $500,000 or twice the value of the property involved in the offense or twice the gross gain derived from the offense up to $820,000,000, whichever is greater.

**Forfeiture**:  18 U.S.C. § 982; 21 U.S.C. § 853, and 28 U.S.C. § 2461

Any property constituting or derived from any proceeds defendants obtained, directly or indirectly, as a result of the violations and any property used or intended to be used to commit or facilitate the commission of the violations, as well as any property traceable to such property and any substitute assets.

1  MELINDA HAAG (CABN 132612)
   United States Attorney
2

**FILED**

AUG 1 4 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                            SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,              )  NO. CR 14-380 CRB
                                           )
12        Plaintiff,                        )  VIOLATIONS: 21 U.S.C. § 846 – Conspiracy to
                                           )  Distribute Controlled Substances;
13     v.                                   )  21 U.S.C. § 841 – Distribution of Controlled
                                           )  Substances;
14  FEDEX CORPORATION,                     )  18 U.S.C. § 371 – Conspiracy to Distribute
    FEDERAL EXPRESS CORPORATION,           )  Misbranded Drugs;
15  (A/K/A FEDEX EXPRESS), and             )  21 U.S.C. §§ 331, 333, and 353 – Misbranding Drugs;
    FEDEX CORPORATE SERVICES, INC.,        )  18 U.S.C. § 1956 – Conspiracy to Launder Money;
16                                          )  18 U.S.C. §§ 982; 21 U.S.C. § 853 and 28 U.S.C.
          Defendants.                       )  § 2461 – Forfeiture
17                                          )
                                           )  SAN FRANCISCO VENUE
18  _____    )

19                     S U P E R S E D I N G   I N D I C T M E N T

20  The Grand Jury charges:

21                        INTRODUCTORY ALLEGATIONS

22        At all times relevant to this Superseding Indictment:

23                                    Defendants

24        1.     Defendants FEDEX CORPORATION, FEDERAL EXPRESS CORPORATION

25  ("FEDEX EXPRESS"), and FEDEX CORPORATE SERVICES, INC. ("FEDEX SERVICES")

26  (collectively, "FEDEX"), were package delivery companies and providers of specialized transportation

27  and logistics services that delivered packages to persons located in the Northern District of California

28  and throughout the United States.  FEDEX EXPRESS and FEDEX SERVICES were wholly owned

SUPERSEDING INDICTMENT
CR 14-380 CRB

1  subsidiaries of FEDEX CORPORATION.

2  <div align="center">Summary of Alleged Conduct</div>

3  A.  Illegal Internet Pharmacies

4  2.  Beginning in approximately 1998, numerous companies began offering consumers
5  prescription drugs, including controlled substances, based on the provision of information over the
6  Internet. These companies came to be known as Internet or online pharmacies, both terms used
7  interchangeably throughout this Superseding Indictment. Some Internet pharmacies were managed by
8  well-known pharmacy chains that required valid prescriptions and visits to the patient's personal
9  physician before an order was filled. Others failed to require a prescription before filling orders for any
10 drugs, and distributed controlled substances and prescription drugs based solely on the completion of an
11 online questionnaire, without a physical examination, diagnosis, or face-to-face meeting with a
12 physician. Such practices violated federal and state laws governing the distribution of prescription drugs
13 and controlled substances.

14 3.  Internet pharmacies generally operated websites that advertised the sale of various
15 controlled substances and prescription drugs. Through the websites, customers typically placed orders
16 for drugs by answering an online questionnaire calling for basic information such as height, weight and
17 date of birth, making payment arrangements, and providing a shipping address. Internet pharmacies
18 worked with fulfillment pharmacies that carried an inventory of controlled substances and prescription
19 drugs. After filling the order referred by the Internet pharmacy, the fulfillment pharmacy delivered the
20 drugs to the customer by a shipper such as FEDEX.

21 4.  From at least as early as 2004, on no less than six different occasions, the DEA, FDA, or
22 members of Congress and their staff informed FEDEX that illegal Internet pharmacies were using its
23 shipping services to distribute controlled substances and prescription drugs in violation of the Controlled
24 Substances Act (CSA) and Food Drug and Cosmetic Act (FDCA). These government officials informed
25 senior FEDEX management that a prescription based solely on a customer's completion of an online
26 questionnaire was invalid and that controlled substances and prescription drugs dispensed based on such
27 an invalid prescription were distributed in violation of the CSA, FDCA, and numerous state laws. The
28 government officials similarly informed FEDEX that doctors writing such prescriptions and pharmacists

SUPERSEDING INDICTMENT                    2
CR 14-380 CRB

1  filling them were acting outside the usual course of professional practice and not for a legitimate
2  medical purpose, according to guidelines published by the American Medical Association (AMA),
3  Federation of State Medical Boards (FSMB), and National Association of Boards of Pharmacy (NABP).

4  B.    The Chhabra-Smoley Organization and Superior Drugs

5     5.    During the time covered by this Superseding Indictment, FEDEX shipped controlled
6  substances and prescription drugs for two illegal Internet pharmacy organizations, among others: (1) the
7  Chhabra-Smoley Organization, which operated a network of illegal Internet and fulfillment pharmacies
8  through its principals Vincent Chhabra and Robert Smoley, and (2) Superior Drugs, which was an illegal
9  fulfillment pharmacy that filled drug orders for illegal Internet pharmacies. FEDEX knew that the
10  Chhabra-Smoley Organization and Superior Drugs were each distributing controlled substances and
11  prescription drugs based solely on a customer's completion of an online questionnaire, and that these
12  organizations were distributing drugs outside the usual course of professional practice and not for a
13  legitimate medical purpose in violation of the law. Nevertheless, FEDEX continued to ship controlled
14  substances and prescription drugs for the Chhabra-Smoley Organization and Superior Drugs.

15     6.    In 2003, the DEA shut down RxNetwork, the Chhabra-Smoley Organization's primary
16  fulfillment pharmacy, and Chhabra was arrested for violating the CSA. FedEx learned of these events
17  promptly after they occurred, but FEDEX continued to distribute controlled substances and prescription
18  drugs for the Chhabra-Smoley Organization through Internet and fulfillment pharmacies that were
19  controlled by and affiliated with Smoley and other members of the Chhabra-Smoley Organization.
20  FEDEX knew of the connection between these Internet and fulfillment pharmacies and RxNetwork and
21  Chhabra as demonstrated by the principals, company names, shipping addresses and billing addresses
22  that were initially connected to Chhabra and RxNetwork and remained common to Smoley and the
23  members of the Chhabra-Smoley Organization who continued operations after Chhabra's arrest.
24  FEDEX's employees explicitly recognized this connection. For example, in a discussion with FEDEX
25  managers in the Sales and Revenue Operations departments, one employee stated that the controller for
26  Smoley's Internet pharmacy Icom had two other Internet pharmacy accounts: RxNetwork and Dipardi
27  Pharmacy, another fulfillment pharmacy used by Chhabra prior to his arrest.

28     7.    In addition to knowing that Superior Drugs illegally distributed controlled substances and

SUPERSEDING INDICTMENT                    3
CR 14-380 CRB

1   prescription drugs based on an online questionnaire, FEDEX knew that Superior Drugs filled orders for
2   Internet pharmacies that were shut down by the DEA or other law enforcement agencies. FEDEX
3   further knew Superior Drugs would fill orders for Internet pharmacies after a fulfillment pharmacy they
4   had been using was shut down by law enforcement. Despite this knowledge, FEDEX continued to
5   distribute controlled substances and prescription drugs for Superior Drugs. For example, when the DEA
6   closed the Waterview fulfillment pharmacy in Maryland, employees in FEDEX's Sales department
7   discussed the fact that CNL Financial, an Internet pharmacy that had used Waterview, had transferred its
8   orders to Superior Drugs. FEDEX continued to ship controlled substances and prescription drugs for
9   CNL Financial from Superior Drugs.

10  C.      FEDEX's Internet Pharmacy Policies

11          8.      By 2004, illegal Internet pharmacies increasingly were being investigated and closed by
12  DEA and other law enforcement and government agencies, which in turn affected FEDEX's revenue.
13  During this time, Internet pharmacy customers were increasingly causing safety issues for FEDEX
14  drivers in their efforts to secure the controlled substances and prescription drugs they had ordered
15  online. In response to these issues, FEDX enacted policies and procedures that allowed FEDEX to
16  continue to ship controlled substances and prescription drugs for illegal Internet pharmacies while
17  protecting against lost revenue and addressing its employees' compensation and safety issues.

18          i.      *FEDEX's Online Pharmacy Credit Policy*

19          9.      In virtually all cases, when law enforcement closed an illegal Internet pharmacy, FEDEX
20  was unable to collect outstanding accounts payable from that customer. To address this issue, beginning
21  in June 2004, FEDEX established an Online Pharmacy Credit Policy that applied only to its Internet
22  pharmacy shippers. Under this policy, all Internet pharmacy shippers had to be approved by the Credit
23  Department prior to opening a new account. Existing Internet pharmacies had to be reviewed by the
24  Credit Department to ensure that they had adequate financial security. In arguing for the Online
25  Pharmacy Credit Policy, FEDEX's Managing Director of Revenue Operations stated "[a]s the past few
26  weeks have unfolded it is becoming more apparent to us that many of these companies are fraudulent
27  and doing business outside Federal regulations." After receiving this e-mail, FEDEX's Vice President
28  of Worldwide Revenue Operations approved FEDEX's continued shipment of drugs pursuant to the

SUPERSEDING INDICTMENT                        4
CR 14-380 CRB

1  proposed Online Pharmacy Credit Policy. The policy was also approved by FEDEX EXPRESS's Chief

2  Financial Officer and FEDEX SERVICES' President of Customer Information Services and Senior Vice

3  President of Sales.

4      10.  By 2006, FEDEX had strengthened the Online Pharmacy Credit Policy to require that all

5  online pharmacies be placed on restricted credit terms and provide FEDEX with a security deposit or

6  bank letter of credit. On July 6, 2006, the Credit Policy was circulated to FedEx's Managing Directors

7  of Sales with the following explanation for "Why this is important": "Many of these companies operate

8  outside federal and state regulations over the sale of controlled drugs, which require diagnosis and

9  prescription by a licensed physician. Drugs purchased from these sites may be diluted or counterfeit.

10  Several sites have been shut down by the government without warning or simply disappeared leaving

11  large balances owing to FEDEX."

12      11.  Beginning in 2004, FEDEX's Credit analysts maintained a list of FEDEX's online

13  pharmacy customers that was regularly reviewed by FEDEX's Senior Manager and Managing Director

14  of Revenue Operations. As of July 2004, FEDEX employees had identified over 200 accounts that were

15  associated with online pharmacies. By September of 2010, the list had increased to over 600 online

16  pharmacy accounts.

17      12.  On two occasions, in July of 2004 and December of 2005, FEDEX's Senior Vice

18  President of Corporate Security testified before congressional committees on the subject of the illegal

19  distribution of controlled substances and prescription drugs by online pharmacies. FEDEX's Senior

20  Vice President testified under oath that "[t]hese so-called Internet pharmacies are virtual entities and

21  cannot be linked by us to a shipping site, unless law enforcement makes that association for us."

22  However, in July of 2004, FEDEX's Credit Department had a list of more than 200 FEDEX accounts

23  that FEDEX employees had identified as Internet pharmacies and were able to link to a shipping site. In

24  December of 2005, there were more than 250 FEDEX accounts on FEDEX's list of Internet pharmacies

25  that FEDEX's employees were able to link to shipping sites.

26  ///

27  ///

28  ///

SUPERSEDING INDICTMENT          5
CR 14-380 CRB

*ii.   FEDEX's Use of its "Catchall" Classification for Internet Pharmacies*

13.   FEDEX maintained a Field Sales Department that was responsible for recruiting new customers for FEDEX with potential revenue of up to approximately $1 million. Within Field Sales, each employee was assigned a fiscal-year sales goal, which was a factor in FEDEX's Variable Compensation Plan. A Sales employee's goal was determined, in part, by the Sales employee's previous year sales. Each year, FEDEX's Sales employees were expected to increase the revenue in their territory. Any customers that were lost were expected to be replaced with new customers with an equal amount of revenue, so that the Sales employee could meet his or her goal for the year.

14.   Beginning in 2004, Sales employees began to experience revenue losses due to the closure of online pharmacies by law enforcement. At the end of 2005, FEDEX's Sales Department began looking for a streamlined way to address the impact on the Field Sales executives' compensation caused by Internet pharmacy accounts quickly opening, shipping large amounts of express packages, and then being shut down by law enforcement.

15.   FEDEX maintained a shipping account classification known as "catchall." Catchall accounts were not assigned to specific account executives and did not affect the yearly sales goals of account executives or their managers. In 2006, a group of FEDEX's Sales employees proposed that all online pharmacy accounts be assigned to the catchall classification because, as one Managing Director stated to the Vice President of Field Sales for the Eastern Region, "I can assure you that these types of accounts will always result in a loss at some point. They have a very short lifespan and will eventually be shut down by the DEA."

16.   On March 29, 2007, a Senior Sales Analyst sent an e-mail to Sales employees informing them that any currently known online pharmacy accounts were to be moved to the "catchall" classification pursuant to an agreement between the Field Sales Vice Presidents. The stated reason for this policy was, "The internet pharmacy industry is governed by strict DEA laws. This type of business is generally very volatile in nature (i.e., here one day and gone the next). There are often numerous large volume shifts associated with internet pharmacies as they move the shipping location often to avoid detection from the DEA."

///

*iii.*  *FEDEX's Holding of Shipments for Internet Pharmacy Customers*

17.  As early as 2004, FEDEX couriers and customer service agents in Kentucky, Tennessee, and Virginia expressed safety concerns to their management, including the following: FEDEX trucks had been stopped on the road by Internet pharmacy customers demanding packages of pills; delivery addresses included parking lots, schools, and vacant homes where people would wait for deliveries of drugs; customers would jump on FEDEX trucks and demand Internet pharmacy packages; FEDEX drivers were threatened if they insisted on delivering a package to the address instead of giving the package to the customer who demanded it; and customers would use multiple names and identification documents to pick up packages of drugs.

18.  A FEDEX employee also raised concerns to FEDEX management that some recipients of Internet pharmacy packages were engaged in "doctor shopping," were "known to be selling and using," and that "some of the recipients have overdosed and died."

19.  In response to these concerns, FEDEX's Senior Vice President of Security approved a procedure whereby Internet pharmacy packages from problematic shippers were held for pick up at specific stations, rather than delivered to the recipient's address. This policy was eventually expanded to include all Internet pharmacy packages delivered to the stations that were experiencing concerns.

20.  FEDEX employees, including its Vice President of Worldwide Revenue Operations and Managing Director of Security, were aware that its online pharmacy customers were shipping drugs to drug addicts who had died after FEDEX delivered drugs to them, including:

   a.  A customer service representative and Security manager in Kentucky discussed a recipient who was found dead of a drug overdose one day after she had picked up a package at a FEDEX station from an online pharmacy. The deceased woman was well known to FEDEX employees as she had been receiving multiple packages from online pharmacies.

   b.  A memorandum drafted by FEDEX's Senior Manager of Revenue Operations and sent to FEDEX's Vice President of Worldwide Revenue Operations stated, "Many online pharmacy customers have been closed by the federal government due to fraud and illegal sales of controlled pharmaceutical products. In a recent

SUPERSEDING INDICTMENT                      7
CR 14-380 CRB

1    case, a teenager died after being illegally supplied with a controlled drug that was

2    delivered by FEDEX."

3    21.    FEDEX delivered controlled substances and prescription drugs from online pharmacies to

4    individuals who subsequently died or accidentally caused the death of others, including but not limited

5    to on or about: August 6, 2002, November 8, 2005, February 24, 2006, March 16, 2006, and March 20,

6    2009.

7    ///

8    ///

9    ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

1  **COUNT ONE**:    (21 U.S.C. § 846 – Conspiracy to Distribute Controlled Substances)

2       22.    Paragraphs 1 through 21 are realleged and reincorporated herein by reference.

3       23.    Beginning at a time unknown to the grand jury, but no later than January of 2000, and

4  ending on or about February 20, 2008, in the Northern District of California and elsewhere, the

5  defendants,

6                              FEDEX CORPORATION,
                          FEDERAL EXPRESS CORPORATION,
7                          (A/K/A FEDEX EXPRESS), and
                          FEDEX CORPORATE SERVICES, INC.,

8

9  together with Vincent Chhabra, Sabina Faruqui, Robert Smoley, RxNetwork, United Mail Pharmacy

10  Services, Icom Group, and others known and unknown to the grand jury, conspired to distribute, and to

11  possess with intent to distribute outside the usual course of professional practice and not for a legitimate

12  medical purpose one or more controlled substances, knowing and intending that the distribution and

13  possession with intent to distribute was outside the usual course of professional practice and not for a

14  legitimate medical purpose, which offense involved substances containing:  (a) Phendimetrazine, a

15  Schedule III controlled substance; (b) Ambien, a Schedule IV controlled substance; (c) Phentermine, a

16  Schedule IV controlled substance; (d) Diethylpropion, a Schedule IV controlled substance;

17  (e) Diazepam, a Schedule IV controlled substance; (f) Alprazolam, a Schedule IV controlled substance;

18  (g) Clonazepam, a Schedule IV controlled substance; and (h) Butalbital, a Schedule III controlled

19  substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(D) and (b)(2), all of

20  which conduct was in violation of Title 21, United States Code, Section 846.

21                         Manner and Means of the Conspiracy

22  It was part of the conspiracy that:

23  A.    Operation of the Chhabra-Smoley Organization

24       24.    Unindicted co-conspirators Vincent Chhabra and Robert Smoley owned, operated and

25  managed a widespread organization of Internet pharmacy websites, fulfillment pharmacies, and support

26  systems for the purpose of providing controlled substances directly to consumers without valid

27  prescriptions (the "Chhabra-Smoley Organization").

28       25.    The Chhabra-Smoley Organization consisted of websites with which Chhabra and

1 Smoley were affiliated, including get-it-on.com, cybrx.com, USAPrescription.com, myrxeasy.com,
2 ezrxovernight.com, fastplanetrx.com, ezmedsonline.com, and others, which offered for sale controlled
3 substances on Schedules III and IV, by means of the Internet, to customers who were only required to
4 complete an online questionnaire and were not examined, diagnosed, or contacted by the physicians who
5 issued the prescriptions in connection with their orders.

6 26. The Chhabra-Smoley Organization also included physicians whom Chhabra and Smoley
7 partnered with, recruited, and hired to review the customers' online questionnaires and to issue
8 prescriptions for controlled substances based solely upon the customers' responses.

9 27. The Chhabra-Smoley Organization also included fulfillment pharmacies that Chhabra
10 and Smoley owned, operated, partnered with, and recruited throughout the United States, including
11 RxNetwork, Next Generation Health Systems, Prescriptions & Travel, Prescription Resources,
12 Lakeridge Pharmacy, C&V Pharmacy, 2U Net-Mail (Choice Rx), Rx Direct, Dipardi Pharmacy, Falks
13 Lignell (Falk's Home Medical Supply), United Mail Pharmacy Services, United Care Pharmacy, Kwic
14 Fill, and Tri-Phasic Pharmacy, among others, to fill invalid prescriptions for controlled substances and
15 to ship those controlled substances to customers in the Northern District of California and elsewhere in
16 the United States.

17 28. The Chhabra-Smoley Organization also included employees and associates whom
18 Chhabra and Smoley hired to call, respond to calls, and send e-mails to existing and prospective
19 customers in the Northern District of California and elsewhere in the United States to solicit orders for
20 controlled substances and refills of invalid prescriptions for controlled substances.

21 29. Chhabra and Smoley arranged for the continuation of the Chhabra-Smoley Organization
22 following Chhabra's December 3, 2003, arrest on charges of violating the CSA, by entering into an
23 arrangement whereby Smoley assumed responsibility for the running of the Chhabra-Smoley
24 Organization.

25 B. FEDEX's Shipment of Illegal Drugs for the Chhabra-Smoley Organization

26 30. FEDEX employees – including those who (a) negotiated and entered into the written
27 agreements with the Chhabra-Smoley Organization on behalf of FEDEX, (b) managed the Chhabra-
28 Smoley Organization accounts for FEDEX, and (c) maintained the Chhabra-Smoley Organization's

SUPERSEDING INDICTMENT 10
CR 14-380 CRB

1 business relationship with FEDEX, including its credit and payment terms – knew that the Chhabra-
2 Smoley Organization was distributing controlled substances based on prescriptions issued by doctors
3 after reviewing customers' responses to an online questionnaire.

4     31.    Chhabra and Smoley and their employees and associates entered into agreements with
5 FEDEX in which FEDEX agreed to ship packages for the Chhabra-Smoley Organization. As part of
6 these agreements, FEDEX opened over 30 accounts for the Chhabra-Smoley Organization, which the
7 Chhabra-Smoley Organization used to illegally distribute controlled substances into the Northern
8 District of California and elsewhere in the United States.

9     32.    FEDEX's employees communicated on a regular basis with Chhabra, Smoley, and other
10 employees of the Chhabra-Smoley Organization in writing, by telephone, and in person regarding the
11 Chhabra-Smoley Organization's business trends, volume, and shipping and logistics needs.

12     33.    FEDEX employees visited the premises of the Chhabra-Smoley Organization, including
13 its headquarters and the locations of its fulfillment pharmacies. These employees observed the Chhabra-
14 Smoley Organization's operations, including the taking of orders for controlled substances over the
15 telephone and Internet and the filling of orders for controlled substances.

16     34.    FEDEX employees observed packages from the Chhabra-Smoley Organization
17 containing pill bottles filled with controlled substances; FEDEX employees assisted with preparing these
18 packages for shipment and subsequently distributed these packages for the Chhabra-Smoley
19 Organization in the Northern District of California and throughout the United States.

20     35.    FEDEX employees and their contractors communicated with employees of the Chhabra-
21 Smoley Organization on a regular basis regarding lost, stolen, or delayed FEDEX shipments of
22 controlled substances.

23     36.    FEDEX employees knew that online pharmacies and fulfillment pharmacies affiliated
24 with the Chhabra-Smoley Organization were closed down by state and federal law enforcement
25 agencies, including the FDA and DEA, and that their owners, operators, pharmacists, and doctors were
26 indicted, arrested, and convicted of violating the CSA, including:

27          a.    On July 23, 2002, a FEDEX employee placed a note in FEDEX's electronic
28             account record for Rx Network, "Co has had its license suspended by the state of

Florida in an emergency order that said the pharmacy constitutes 'an immediate and serious danger.'"

b. On November 12, 2003, a FEDEX employee received an e-mail in which she was "advised Rx Network license was suspended for selling illegal prescriptions thru the internet – I forward email to [the Sales] A/E – advised cust has to increase weekly pmt to 150,000 to ensure shipping privileges."

c. On January 30, 2004, a Sales executive informed his co-worker that he should not be responsible for increasing business from the Prescription Resources account, a fulfillment pharmacy for the Chhabra-Smoley Organization, because "State/Fed law closed this facility down about two months ago. It continues to pop up at various places in the country, one step ahead of state regulators, I believe."

d. In June 2004, FEDEX's Senior Manager of Revenue Operations learned that Chhabra had been indicted for his involvement with Internet drug sales. He further learned that three doctors and two pharmacists involved in the Chhabra-Smoley Organization had pleaded guilty to drug trafficking based on "illegally selling excessive quantities of controlled substances – diet pills – through websites by simply having customers fill out online questionnaires without anyone checking the accuracy of the questionnaires."

e. On March 17, 2006, FEDEX's Managing Director of Sales for the Gulf States Region approved a goal adjustment for the Sales executive responsible for one of Smoley's accounts based on the reason "FDA forced closure of primary supplier for Internet pharmacy. Unable to supply customers with product."

37. In each instance, with the knowledge that these and other members of the Chhabra-Smoley Organization had been subject to law enforcement action for illegally shipping controlled substances, FEDEX continued to deliver controlled substances for the Chhabra-Smoley Organization.

38. FEDEX employees knew that the purpose of the Chhabra-Smoley Organization was to provide controlled substances to consumers without the need for a face-to-face meeting with, or physical examination, laboratory tests, or diagnosis, by a physician. FEDEX employees knew that this practice

SUPERSEDING INDICTMENT                          12
CR 14-380 CRB

1  violated the CSA, FDCA, and numerous state laws. FEDEX employees knew that the practice of
2  prescribing medication based solely on a physician's review of an online questionnaire, without a
3  physical examination, laboratory tests, or face-to-face meeting was not in accordance with the usual
4  course of medical and pharmacy practice according to the positions of the AMA, FSMB, NABP, and
5  numerous state laws. FEDEX employees further knew that the Chhabra-Smoley Organization
6  distributed controlled substances to customers who had no legitimate medical need for them.

7       39.     FEDEX departed from its usual business practices to participate in and facilitate the
8  Chhabra-Smoley Organization's unlawful sale of controlled substances. According to FEDEX's Service
9  Guide and Tariff, as well as the understanding of its employees, FEDEX did not ship contraband,
10  including illegal drugs, in the usual course of business. FEDEX also deviated from its usual course of
11  business by applying its Online Pharmacy Credit Policy to the Chhabra-Smoley Organization. FEDEX
12  further deviated from its usual course of business by placing assigning accounts associated with the
13  Chhabra-Smoley Organization to the catchall classification for purposes of determining compensation
14  for its sales executives, pursuant to FEDEX's Online Pharmacy Catchall Policy.

15       40.     FEDEX knew that controlled substances were distributed to consumers by the Chhabra-
16  Smoley Organization without regard to the age of the buyers and were a likely means by which
17  underage persons obtained controlled substances absent the supervision of an attending physician.
18  Although FEDEX had an "adult-signature" service that it mandated be used by all alcohol shippers,
19  FEDEX did not require that this service be used by the Chhabra-Smoley Organization. Even when the
20  Chhabra-Smoley Organization voluntarily used this service, FEDEX allowed packages to be re-routed at
21  the direction of the customer or left at a third-party vendor. FEDEX's employees knew that underage
22  customers could use these services to avoid the adult-signature requirement.

23       All in violation of Title 21, United States Code, Section 846.

24  ///
25  ///
26  ///
27  ///
28  ///

SUPERSEDING INDICTMENT         13
CR 14-380 CRB

1 **COUNTS TWO THROUGH TEN**: (21 U.S.C. § 841 – Distribution of Controlled Substances)

2     41.     Paragraphs 1 through 21 and 24 through 40 are realleged and reincorporated herein by
3 reference.

4     42.     On or about the dates listed below, in the Northern District of California and elsewhere,
5 the defendants,

6
FEDEX CORPORATION,
FEDERAL EXPRESS CORPORATION,
7 (A/K/A FEDEX EXPRESS), and
FEDEX CORPORATE SERVICES, INC.,
8

9 did possess with intent to distribute and distribute outside the usual course of professional practice and
10 not for a legitimate medical purpose one or more controlled substances, knowing and intending that the
11 distribution and possession with intent to distribute was outside the usual course of professional practice
12 and not for a legitimate medical purpose, which offense involved substances containing those listed
13 below:

| COUNT | DATE | TRACKING NUMBER | CONTROLLED SUBSTANCE |
|-------|------|-----------------|----------------------|
| 2 | 7/19/2007 | 799181999045 | Diethylpropion |
| 3 | 7/24/2007 | 799681810394 | Phentermine |
| 4 | 7/24/2007 | 792529082334 | Phentermine |
| 5 | 7/25/2007 | 798227118185 | Phentermine |
| 6 | 7/25/2007 | 790791710858 | Phentermine |
| 7 | 7/26/2007 | 798726973512 | Adipex |
| 8 | 7/26/2007 | 790792659716 | Phentermine |
| 9 | 7/27/2007 | 790792659841 | Diazepam |
| 10 | 7/27/2007 | 790301123749 | Phentermine |

25     Each in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(D) and/or (b)(2).

27 ///

28 ///

SUPERSEDING INDICTMENT      14
CR 14-380 CRB

1  **COUNT ELEVEN**: (18 U.S.C. § 371 – Conspiracy to Distribute Misbranded Drugs in Interstate
Commerce)
2

3     43.   Paragraphs 1 through 21 and 24 through 40 are realleged and reincorporated herein by
4  reference.

5     44.   Beginning at a time unknown to the grand jury, but no later than January of 2000, and
6  ending on or about February 20, 2008, in the Northern District of California and elsewhere, the
7  defendants,

8
                       FEDEX CORPORATION,
              FEDERAL EXPRESS CORPORATION,
9
                 (A/K/A FEDEX EXPRESS), and
           FEDEX CORPORATE SERVICES, INC.,
10

11  together with Vincent Chhabra, Sabina Faruqui, Robert Smoley, RxNetwork, United Mail Pharmacy
12  Services, Icom Group, and others known and unknown to the grand jury, conspired to distribute and
13  dispense prescription drugs to consumers in various locations throughout the United States, including
14  the Northern District of California, without valid prescriptions from licensed practitioners, which caused
15  the drugs to be misbranded while held for sale after their shipment in interstate commerce, and did so
16  with the intent to defraud and mislead as to a material matter, in violation of Title 21, United States
17  Code, Sections 331(k), 333(a)(1), (a)(2), and 353(b), all of which conduct was in violation of Title 18,
18  United States Code, Section 371.

19                           Manner and Means of the Conspiracy

20  It was part of the conspiracy that:

21     45.   Paragraphs 1 through 21 and 24 through 40 are realleged and reincorporated herein by
22  reference.

23     46.   It is further alleged that each and every aspect of the conduct alleged in paragraphs 24
24  through 40 as the manner and means of the conspiracy involving controlled prescription drugs also
25  involved non-controlled prescription drugs.

26     47.   The prescription drugs were distributed with the intent to defraud and mislead in that:
27          a.   The Chhabra-Smoley Organization and its related online and fulfillment
28               pharmacies falsely and fraudulently represented to consumers and government

SUPERSEDING INDICTMENT            15
CR 14-380 CRB

1  agencies that physicians had written valid prescriptions for the drugs they were
2  distributing.

3      b.    The Chhabra-Smoley Organization falsely and fraudulently represented to
4  consumers and government agencies that no prescription was required to obtain
5  the controlled and non-controlled prescription drugs advertised on its websites
6  and that the "prescription" issued by a doctor employed by the online pharmacy
7  based solely on his or her review of the responses to an online questionnaire was
8  valid and in accordance with federal and state law.

9      c.    The Chhabra-Smoley Organization and its associated fulfillment pharmacies and
10  pharmacists falsely and fraudulently represented to consumers and government
11  agencies that the prescription drugs were dispensed pursuant to valid prescriptions
12  after review by a pharmacist in accordance with federal and state law.

13      d.    The Chhabra-Smoley Organization falsely and fraudulently represented to
14  customers who sought to obtain prescription drugs, but who lacked prescriptions
15  from their personal physicians, and to government agencies, that the websites
16  were a legitimate, lawful, safe, and responsible source for these drugs.

### Overt Acts

18  48.    On or about April 26, 2000, FEDEX delivered 30 pills of Meridia, a controlled
19  prescription drug, from ChoiceRx, 14300 Justice Road, Ste. B, Midlothian, Virginia, that had been
20  ordered by FDA agents in Maryland on or about April 7, 2000, from privacyrx.com by completing an
21  online questionnaire.

22  49.    On or about February 7, 2001, FEDEX delivered 30 pills of Phentermine, a controlled
23  prescription drug, from Rx Network of Florida, 5400 S University Dr., Ste. 104, Davie, Florida, that had
24  been ordered by the Federation of State Medical Boards (FSMB) on or about February 6, 2001, from
25  eprescribe.com by completing an online questionnaire.

26  50.    On or about December 3, 2001, FEDEX delivered 10 pills of Viagra, a prescription drug,
27  from United Mail Pharmacy Services, 800 E Hallandale, Hallandale, Florida, that had been ordered by

1   the FSMB on or about November 30, 2001, from viagraovernight.com by completing an online
2   questionnaire.

3      51.    On or about June 28, 2002, FEDEX delivered 30 pills of Phentermine, a controlled
4   prescription drug, from Rx Network, 5400 S University Dr., Ste. 107, Davie, Florida, that had been
5   ordered by agents with the Arkansas Attorney General on or about June 27, 2002, from
6   USAPrescription.com by completing an online questionnaire.

7      52.    On or about February 13, 2003, FEDEX delivered 90 pills of Bontril, a controlled
8   prescription drug, from Rx Network of Florida, 5400 S University Dr., Ste. 107, Davie, Florida, that had
9   been ordered by DEA agents in Miami, Florida, on or about February 13, 2003, from eprescribe.com by
10   completing an online questionnaire. The instructions on the website stated that an adult signature would
11   be required for delivery; however, the drugs were shipped to a Mailboxes Etc. and signed for by an
12   employee at the store.

13      53.    On or about November 12, 2003, a FEDEX employee received an e-mail in which she
14   was "advised Rx Network license was suspended for selling illegal prescriptions thru the internet – I
15   forward email to [the Sales] A/E – advised cust has to increase weekly pmt to 150,000 to ensure
16   shipping privileges."

17      54.    On or about November 25, 2003, FEDEX delivered 30 pills of Ambien, a controlled
18   prescription drug, from C&V Pharmacy, 1803 SW 8th Street, Miami, Florida, that had been ordered by
19   FDA agents in Miami, Florida, on or about November 21, 2003, from medpharmacy.com by filling out
20   an online questionnaire.

21      55.    On or about March 4, 2004, FEDEX delivered 10 pills of Cialis, a prescription drug, from
22   United Mail, 800 E Hallandale Bch Blvd #18, Hallandale, Florida, that had been ordered by the FSMB
23   on or about March 3, 2004, from completerxonline.com by filling out an online questionnaire.

24      56.    On or about March 31, 2004, FEDEX Credit analysts sent a list of FEDEX's online
25   pharmacy accounts to the Managing Director and Senior Manager of Revenue Operations that included
26   over 20 accounts associated with the Chhabra-Smoley Organization.

27

28

SUPERSEDING INDICTMENT        17
CR 14-380 CRB

57. In or about September of 2004, FEDEX's Credit analysts worked with FEDEX's Sales employees to obtain financial security for accounts used by the Chhabra-Smoley Organization pursuant to FEDEX's Online Pharmacy Credit Policy.

58. In or about April of 2007, accounts associated with the Chhabra-Smoley Organization were assigned to the catchall classification by FEDEX's Field Sales employees, pursuant to the Online Pharmacy Catchall Policy that had been approved by FEDEX's Field Sales Vice Presidents.

59. On or about July 26, 2007, FEDEX delivered 30 pills of Phentermine, a controlled prescription drug, from United Mail Pharmacy, 800 Hallandale Beach Blvd., Hallandale Beach, Florida, that had been ordered by a customer located in Napa, California, on or about July 25, 2007, from fastplanetrx.com by completing an online questionnaire.

60. In or about October of 2007, FEDEX's Sales analysts reviewed the placement of accounts associated with the Chhabra-Smoley Organization in catchall and obtained the approval of the Senior Vice President of Field Sales to maintain these "high value" accounts in the catchall classification pursuant to the Online Pharmacy Catchall Policy.

61. In or about January of 2008, a FEDEX contractor sent to a FEDEX Security manager a list of packages containing "Red Flag Pharmaceuticals" that had been identified for destruction. The list included a package containing Phentermine, a controlled prescription drug, that had been shipped by FEDEX for United Mail LLC, a fulfillment pharmacy used by the Chhabra-Smoley Organization.

All in violation of Title 18, United States Code, Section 371.

///

///

///

///

///

///

///

///

///

SUPERSEDING INDICTMENT                    18
CR 14-380 CRB

1 **COUNT TWELVE**: (18 U.S.C. § 1956 – Conspiracy to Launder Money)

2      62.     Paragraphs 1 through 21, 24 through 40, and 46 through 61 are realleged and
3 reincorporated herein by reference.

4      63.     Beginning at a time unknown to the grand jury, but no later than January of 2000, and
5 ending on or about February 20, 2008, in the Northern District of California and elsewhere, the
6 defendants,

7
8
9

<div align="center">
FEDEX CORPORATION,<br>
FEDERAL EXPRESS CORPORATION,<br>
(A/K/A FEDEX EXPRESS), and<br>
FEDEX CORPORATE SERVICES, INC.,
</div>

10 together with Vincent Chhabra, Sabina Faruqui, Robert Smoley, RxNetwork, United Mail Pharmacy
11 Services, Icom Group, and others known and unknown to the grand jury, did knowingly and
12 intentionally conspire to conduct a financial transaction involving the proceeds of a specified unlawful
13 activity, knowing that the property involved in the financial transaction represented proceeds of some
14 form of unlawful activity, and intending to promote the carrying on of the specified unlawful activity, to
15 wit: the possession with intent to distribute and distribution of controlled substances outside the usual
16 course of professional practice and not for a legitimate medical purpose, knowing and intending that the
17 possession with intent to distribute and distribution was outside the usual course of professional practice
18 and not for a legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a),
19 841(b)(1)(D), (b)(2), and 846, all of which conduct was in violation of Title 18, United States Code,
20 Sections 1956(a)(1)(A)(i) and (h).

21 <div align="center">Manner and Means of the Conspiracy</div>

22 It was part of the conspiracy that:

23      64.     Paragraphs 1 through 21, 24 through 40, and 46 through 61 are realleged and
24 reincorporated herein by reference.

25      65.     For each package containing controlled substances that FEDEX knowingly and
26 intentionally distributed outside the usual course of professional practice and not for a legitimate
27 medical purpose for the Chhabra-Smoley Organization, FEDEX requested payment for providing
28 shipping services.

SUPERSEDING INDICTMENT         19
CR 14-380 CRB

66. Chhabra, Smoley, and their co-conspirators made payments in the form of wire transfers, checks, direct debit, credit card charges, and payments by telephone to FEDEX for FEDEX's shipment of controlled substances obtained outside the usual course of professional practice and not for a legitimate medical purpose for the Chhabra-Smoley Organization.

67. The payments made to FEDEX by Chhabra, Smoley, and their co-conspirators represented proceeds of the illegal sale of controlled substances by the Chhabra-Smoley Organization.

68. FEDEX employees knew that the payments from members of the Chhabra-Smoley Organization represented the proceeds of the sale of controlled substances and prescription drugs based on invalid prescriptions that were issued outside the usual course of professional practice and not for a legitimate medical purpose.

69. The payments made by the Chhabra-Smoley Organization to FEDEX for the shipment of controlled substances knowingly and intentionally outside the usual course of professional practice and not for a legitimate medical purpose, which payments were made with the proceeds of the unlawful sale of controlled substances, included, but were not limited to:

| Date | Payer | Amount |
|------|-------|--------|
| 4/24/2000 | 2U-Netmail LLC | $ 56,951 |
| 12/15/2000 | VKC Consulting, LLC | $ 75,000 |
| 1/8/2002 | USA Prescription, Inc. | $ 245,944 |
| 12/21/2004 | Robert Smoley (American Express) | $ 3,779 |
| 6/7/2005 | Robert Smoley (American Express) | $ 7,734 |
| 9/12/2005 | Robert Smoley (American Express) | $ 4,295 |
| 12/13/2006 | Robert Smoley (American Express) | $ 4,573 |
| 7/26/2007 | Robert Smoley (American Express) | $ 10,558 |
| 11/1/2007 | Robert Smoley (American Express) | $ 3,649 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (h).

///

///

1   **COUNT THIRTEEN**: (21 U.S.C. § 846 – Conspiracy to Distribute Controlled Substances)

2       70.   Paragraphs 1 through 21 are realleged and reincorporated herein by reference.

3       71.   Beginning at a time unknown to the grand jury, but no later than September of 2002, and

4   ending on or about May 12, 2010, in the Northern District of California and elsewhere, the defendants,

5
6
7

FEDEX CORPORATION,
FEDERAL EXPRESS CORPORATION,
(A/K/A FEDEX EXPRESS), and
FEDEX CORPORATE SERVICES, INC.,

8   together with Creative Pharmacy Services (doing business as Superior Drugs), Wayne White, Anthony

9   Spence, Christopher Napoli, Sanford Cohen, Orlando Birbragher, Marshall Kanner, David Glass,

10   Michael Bezonsky, Claude Covino, Genetechnica, Physicians Online Network, The Spence Group,

11   Pharmacom, Carmel Management, SaveOn Rx, SafescriptsOnline, Affpower, and others known and

12   unknown to the grand jury, conspired to distribute, and to possess with intent to distribute outside the

13   usual course of professional practice and not for a legitimate medical purpose one or more controlled

14   substances, knowing and intending that the distribution and possession with intent to distribute was

15   outside the usual course of professional practice and not for a legitimate medical purpose, which offense

16   involved substances containing (a) Phendimetrazine, a Schedule III controlled substance;

17   (b) Phentermine, a Schedule IV controlled substance; (c) Butalbital, a Schedule III controlled substance,

18   and (d) Ambien, a Schedule IV controlled substance, in violation of Title 21, United States Code,

19   Sections 841(a)(1), (b)(1)(D), and (b)(2) (before April 13, 2009), and in violation of Title 21, United

20   States Code, Sections 841(a)(1), (b)(1)(E)(i), (b)(2), (h)(1), and (h)(4) (after April 13, 2009), all of

21   which conduct was in violation of Title 21, United States Code, Section 846.

22                            Manner and Means of the Conspiracy

23   It was part of the conspiracy that:

24   A.   Operation of Superior Drugs

25       72.   Unindicted co-conspirator Wayne White ("White") was the chief pharmacist at Creative

26   Pharmacy Services, doing business as Superior Drugs ("Superior"). White operated Superior as a

27   fulfillment pharmacy that illegally distributed controlled substances without valid prescriptions directly

28   to consumers who had ordered them from Internet pharmacies owned and operated by unindicted co-

SUPERSEDING INDICTMENT       21
CR 14-380 CRB

1 | conspirators Anthony Spence, Christopher Napoli, Sanford Cohen, Orlando Birbragher, Marshall
2 | Kanner, David Glass, Michael Bezonsky, and others known and unknown to the grand jury.

3 | 73. The Internet pharmacies for which Superior filled orders for controlled substances,
4 | including discreetonlinemeds.com, pricebustersrx.com, safescriptsonline.com, safetrustprocessing.com,
5 | rx-max.com, integrarx.com, medscriptsmd.com, dietpillscheap.com, and buymeds.com, offered for sale
6 | controlled substances in Schedules III and IV, by means of the Internet, to customers who were only
7 | required to complete an online questionnaire and were not examined or diagnosed by the physicians who
8 | issued the prescriptions in connection with their orders.

9 | 74. The Internet pharmacies for which Superior filled orders for controlled substances based
10 | on invalid prescriptions partnered with, recruited, and hired throughout the United States and Puerto
11 | Rico physicians to review the customers' online questionnaires and to issue invalid prescriptions for
12 | controlled substances based solely upon the customers' responses.

13 | 75. To meet the high demand for illegally obtained controlled substances, the Internet
14 | pharmacies for which Superior filled orders for controlled substances based on invalid prescriptions
15 | partnered with, recruited, and hired other fulfillment pharmacies throughout the United States, including
16 | Gem Pharmacy, Universal Pharmacy, Union Pharmacy, Waterview Pharmacy, United Care Pharmacy,
17 | Kwic Fill, and SaveOn Rx, among others, to fill invalid prescriptions for controlled substances and to
18 | ship them to customers in the Northern District of California and elsewhere in the United States.

19 | 76. The Internet pharmacies for which Superior filled orders for controlled substances based
20 | on invalid prescriptions hired employees to call, respond to calls, and send e-mails to existing and
21 | prospective customers in the Northern District of California and elsewhere in the United States to solicit
22 | them to order controlled substances or to refill invalid prescriptions for controlled substances.

23 | B. FEDEX's Shipment of Illegal Drugs for Superior

24 | 77. FEDEX employees, including those (a) who negotiated and entered into the written
25 | agreements with Superior and its related Internet and fulfillment pharmacies on behalf of FEDEX,
26 | (b) who managed these accounts for FEDEX, and (c) who maintained the business relationship between
27 | FEDEX and Superior and its related Internet and fulfillment pharmacies, including credit and payment
28 | terms, knew that Superior and its related Internet and fulfillment pharmacies were distributing controlled

SUPERSEDING INDICTMENT 22
CR 14-380 CRB

1  substances based on prescriptions issued by doctors after only reviewing customers' responses to online

2  questionnaires.

3      78.    Unindicted co-conspirators Wayne White, Anthony Spence, Christopher Napoli, Sanford

4  Cohen, Orlando Birbragher, Marshall Kanner, David Glass, Michael Bezonsky, Claude Covino, and

5  others known and unknown to the grand jury and their employees and associates entered into

6  agreements with FEDEX in which FEDEX agreed to ship packages for Superior and the Internet

7  pharmacies for which Superior filled orders for controlled substances based on invalid prescriptions. As

8  part of these agreements, FEDEX opened over 50 accounts for Superior and the Internet pharmacies for

9  which Superior filled orders for controlled substances based on invalid prescriptions. Superior and its

10  related Internet and fulfillment pharmacies used these FEDEX accounts to illegally distribute controlled

11  substances into the Northern District of California and elsewhere in the United States.

12      79.    FEDEX's employees communicated on a regular basis with Wayne White, Anthony

13  Spence, Sanford Cohen, Orlando Birbragher, Marshall Kanner, Claude Covino, David Glass, Michael

14  Bezonsky, and other employees of Superior and its related Internet and fulfillment pharmacies in

15  writing, by telephone, and in person regarding, among other things, business trends, volume, and

16  shipping and logistics needs.

17      80.    FEDEX employees visited the premises of Superior. These employees observed

18  Superior's operations, including the filling of orders for controlled substances.

19      81.    FEDEX employees observed packages from Superior containing pill bottles filled with

20  controlled substances; FEDEX employees assisted with preparing these packages for shipment and

21  subsequently distributed these packages for Superior and its related Internet and fulfillment pharmacies

22  in the Northern District of California and throughout the United States.

23      82.    FEDEX employees and their contractors communicated with employees of Superior and

24  its related Internet and fulfillment pharmacies on a regular basis regarding lost, stolen, or delayed

25  FEDEX shipments of controlled substances.

26      83.    FEDEX employees knew that the purpose of Superior was to provide controlled

27  substances to consumers without the need for a face-to-face meeting with, or physical examination or

28  laboratory tests by, a physician. FEDEX employees knew that this practice violated the CSA, FDCA,

1  and numerous state laws. FEDEX employees further knew that the practice of prescribing medication
2  based solely on a physician's review of an online questionnaire, without a physical examination,
3  laboratory tests, diagnosis, or face-to-face meeting was not in accordance with the usual course of
4  medical and pharmacy practice according to the positions of the AMA, FSMB, NABP, and numerous
5  state laws. FEDEX employees further knew that Superior distributed controlled substances to customers
6  who had no legitimate medical need for them.

7      84.    FEDEX departed from its usual business practices to participate in and facilitate
8  Superior's unlawful sale of controlled substances. According to FEDEX's Service Guide and Tariff, as
9  well as the understanding of its employees, FEDEX did not ship contraband, including illegal drugs, in
10  the usual course of business. FEDEX also deviated from its usual course of business by applying its
11  Online Pharmacy Credit Policy to Superior and its related online and fulfillment pharmacies. FEDEX
12  further deviated from its usual course of business by assigning shipping accounts associated with
13  Superior to the catchall classification for purposes of determining compensation for its sales executives
14  pursuant to FEDEX's Online Pharmacy Catchall Policy.

15      85.    FEDEX employees knew that Superior and online and fulfillment pharmacies affiliated
16  with Superior were closed down by state and federal law enforcement agencies, including the FDA and
17  DEA, and that their owners, operators, pharmacists, and doctors were indicted, arrested, and convicted
18  of violating the CSA, including:

19          a.    In June of 2004, a FEDEX Sales manager sent an e-mail regarding Superior
20             stating, "they were shut down for a few days by the DEA and the company they
21             were fulfilling for moved the business to [another fulfillment pharmacy]." The
22             fulfillment pharmacy to which the business was moved when Superior was shut
23             down was also a FEDEX customer.

24          b.    In March of 2005, the account executive for Superior submitted a request for an
25             adjustment to his sales goals because Superior represented a "significant revenue
26             loss" when "FDA raided their property. No longer ship same volume."

27          c.    In June of 2004, FEDEX's Senior Manager of Credit learned that the online
28             pharmacy American Medical Services, which had been using Superior to ship its

1      drugs, had been closed down by the FDA and DEA, but was now operating as

2      Dynamic Health Solutions.

3          d.    In June of 2006, a district sales manager and credit analyst learned that SaveOn

4      Rx owner Claude Covino had stopped shipping drugs from SaveOn Rx because

5      he was under investigation by the DEA. The manager and analyst determined that

6      Covino was using other fulfillment pharmacies, including Superior Drugs, to

7      continue to ship controlled substances for Internet pharmacies while avoiding

8      detection by the DEA.

9      86.    After April 13, 2009, FEDEX continued to distribute controlled substances for Superior

10     Drugs that had been obtained by means of the Internet, despite the fact that neither Superior Drugs, nor

11     any of the websites that referred orders to Superior Drugs, had obtained a modified DEA registration,

12     despite the fact that the websites did not display any of the statements required by 21 U.S.C. § 831, and

13     despite the fact that prescriptions were issued by doctors employed by the online pharmacies after either

14     review of an online questionnaire or after reviewing a report of a physical examination conducted by a

15     physician who was not unavailable at the time the prescription was issued and who had not requested

16     that the doctor employed by the online pharmacy serve as a covering physician.

17     87.    FEDEX knew that controlled substances were distributed to consumers by Superior and

18     its related Internet and fulfillment pharmacies without regard to the age of the buyers and were a likely

19     means by which underage persons obtained controlled substances absent the supervision and care of an

20     attending physician. Although FEDEX had an "adult-signature required" service that it mandated be

21     used by all alcohol shippers, at no point did FEDEX require that this service be used by Superior and its

22     related Internet and fulfillment pharmacies. Even when Superior voluntarily used this service, FEDEX

23     allowed packages sent from Superior to be re-routed at the direction of the customer or left at a third-

24     party vendor. FEDEX's employees knew that underage customers could use these services to avoid the

25     adult-signature requirement.

26     All in violation of Title 21, United States Code, Section 846.

27     ///

28     ///

SUPERSEDING INDICTMENT      25
CR 14-380 CRB

1   **COUNTS FOURTEEN AND FIFTEEN**:  (21 U.S.C. § 841 – Distribution of Controlled Substances)

2       88.     Paragraphs 1 through 21 and 72 through 87 are realleged and reincorporated herein by

3   reference.

4       89.     On or about the dates listed below, in the Northern District of California and elsewhere,

5   the defendants,

6                               FEDEX CORPORATION,
                            FEDERAL EXPRESS CORPORATION,
7                             (A/K/A FEDEX EXPRESS), and
                          FEDEX CORPORATE SERVICES, INC.,

8

9   did possess with intent to distribute and distribute outside the usual course of professional practice and

10  not for a legitimate medical purpose controlled substances knowing and intending that the distribution

11  and possession with intent to distribute was outside the usual course of professional practice and not for

12  a legitimate medical purpose, which offense involved substances containing those listed below:

| COUNT | DATE | TRACKING NUMBER | CONTROLLED SUBSTANCE |
|-------|------|-----------------|----------------------|
| 14 | 2/7/2008 | 960103326342 | Phentermine |
| 15 | 8/15/2008 | 790069431423 | Phentermine |

17      Each in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(2).

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

SUPERSEDING INDICTMENT                        26
CR 14-380 CRB

1  **COUNT SIXTEEN**: (18 U.S.C. § 371 – Conspiracy to Distribute Misbranded Drugs in Interstate
2  Commerce)

3  90.  Paragraphs 1 through 21 and 72 through 87 are realleged and reincorporated herein by
4  reference.

5  91.  Beginning at a time unknown to the grand jury, but no later than September of 2002, and
6  ending on or about May 12, 2010, in the Northern District of California and elsewhere, the defendants,

7  FEDEX CORPORATION,
   FEDERAL EXPRESS CORPORATION,
8  (A/K/A FEDEX EXPRESS), and
   FEDEX CORPORATE SERVICES, INC.,
9

10  together with Creative Pharmacy Services (doing business as Superior Drugs), Wayne White, Anthony
11  Spence, Christopher Napoli, Sanford Cohen, Orlando Birbragher, Marshall Kanner, David Glass,
12  Michael Bezonsky, Claude Covino, Genetechnica, Physicians Online Network, The Spence Group,
13  Pharmacom, Carmel Management, SaveOn Rx, SafescriptsOnline, Affpower, and others known and
14  unknown to the grand jury, conspired to dispense and distribute prescription drugs, including the
15  prescription drugs identified in paragraphs 10 and 18, to consumers in various locations throughout the
16  United States, including the Northern District of California, without valid prescriptions from licensed
17  practitioners, which caused the drugs to be misbranded while held for sale after their shipment in
18  interstate commerce, and did so with the intent to defraud and mislead as to a material matter, in
19  violation of Title 21, United States Code, Sections 331(k), 333(a)(1), (a)(2), and 353(b), all of which
20  conduct was in violation of Title 18, United States Code, Section 371.

21  Manner and Means of the Conspiracy

22  It was part of the conspiracy that:

23  92.  Paragraphs 1 through 21 and 72 through 87 are realleged and reincorporated herein by
24  reference.

25  93.  Each and every aspect of the conduct alleged in paragraphs 72 through 87 as the manner
26  and means of the conspiracy involving controlled prescription drugs also involved non-controlled
27  prescription drugs.

28  ///

SUPERSEDING INDICTMENT                27
CR 14-380 CRB

1    94.    The prescription drugs were distributed with the intent to defraud and mislead in that:

2           a.    Superior and its related online and fulfillment pharmacies falsely and fraudulently

3                 represented to consumers and government agencies that physicians had written

4                 valid prescriptions for the drugs they were distributing.

5           b.    The online pharmacies falsely and fraudulently represented to consumers and

6                 government agencies that no prescription was required to obtain the controlled

7                 and non-controlled prescription drugs advertised on their websites and that the

8                 "prescription" issued by a doctor employed by the online pharmacy based solely

9                 on his or her review of the responses to an online questionnaire was valid and in

10                accordance with federal and state law.

11          c.    Superior and its associated fulfillment pharmacies and pharmacists falsely and

12                fraudulently represented to consumers and government agencies that the

13                prescription drugs were dispensed pursuant to valid prescriptions after review by

14                a pharmacist in accordance with federal and state law.

15          d.    The Internet pharmacies falsely and fraudulently represented to customers who

16                sought to obtain prescription drugs, but who lacked prescriptions from their

17                personal physicians, and to government agencies, that the websites were a

18                legitimate, lawful, safe, and responsible source for these drugs.

19                                            Overt Acts

20   95.    On or about August 5, 2002, FEDEX delivered 30 pills of Phentermine, a controlled

21   prescription drug, from Superior that had been ordered by FDA agents in Miami, Florida, on or about

22   June 18, 2002, from medscriptsmd.com by completing an online questionnaire.

23   96.    On or about April 8, 2003, FEDEX delivered 30 pills of Bontril, a controlled prescription

24   drug, from Superior that had been ordered by DEA agents in Seattle, Washington, on or about April 4,

25   2003, from integrarx.com by completing an online questionnaire.

26   97.    On or about May 10, 2004, employees in FEDEX's Credit Department prepared a list of

27   FEDEX's online pharmacy customers for FEDEX EXPRESS's Chief Financial Officer. Accounts used

28   by Superior were included on this list.

SUPERSEDING INDICTMENT                          28
CR 14-380 CRB

98. In or about September of 2004, employees in FEDEX's Credit Department worked with employees in FEDEX's Sales Department to obtain financial security for accounts used by Superior pursuant to FEDEX's Online Pharmacy Credit Policy.

99. On or about September 26, 2005, FEDEX delivered 10 pills of Cialis, a prescription drug, from Superior that had been ordered by the Federation of State Medical Boards (FSMB) on or about September 21, 2005, from order-viagra-online.net by completing an online questionnaire.

100. On or about February 27, 2006, FEDEX delivered 60 pills of Phentermine, a controlled prescription drug, from Kwic Fill, Inc. to fill an order placed by DEA agents in San Jose, California, on or about February 24, 2006, for 30 pills of Phentermine from safescriptsonline.com by completing an online questionnaire. FEDEX billed the shipping charges to the account for Superior Drugs.

101. On or about October 26, 2006, FEDEX delivered a package from Superior containing Soma, a prescription pain killer, that an undercover officer had ordered by calling a number left on a deceased woman's telephone by an online pharmacy that was seeking to have the woman refill her order.

102. On or about December 20, 2006, an agent with the DEA informed FEDEX's Senior Vice President of Security that FEDEX had delivered drugs in response to the undercover order placed by the officer discussed in paragraph 101.

103. In or about May of 2007, accounts used by Superior were assigned to the catchall classification pursuant to FEDEX's Online Pharmacy Sales Catchall Policy.

104. On or about May 30, 2008, FEDEX shipped Phentermine, a controlled prescription drug, from Superior to San Mateo, California, in response to an order placed by a customer on or about May 27, 2008 from the RxSource Network by completing an online questionnaire.

105. On or about August 7, 2009, FEDEX delivered 30 pills of Phentermine, a controlled prescription drug, from Superior that had been ordered by DEA agents in Philadelphia, Pennsylvania, on or about June 1, 2009, from discreetonlinemeds.com by completing an online questionnaire and submitting a fictitious report of physical examination that had been created by the agents without the input of a doctor.

///

106.     On or about November 2, 2009, FEDEX delivered 90 pills of Butalbital, a controlled

prescription drug, from Superior that had been ordered by FDA agents in Philadelphia, Pennsylvania, on

or about October 26, 2009, from discreetonlinemeds.com by completing an online questionnaire.

All in violation of Title 18, United States Code, Section 371.

**COUNT SEVENTEEN**:  (18 U.S.C. §  1956 – Conspiracy to Launder Money)

107.     Paragraphs 1 through 21, 72 through 87, and 93 through 106 are realleged and

reincorporated herein by reference.

108.     Beginning at a time unknown to the grand jury, but no later than September of 2002, and

ending on or about May 12, 2010, in the Northern District of California and elsewhere, the defendants,

<div align="center">

FEDEX CORPORATION,<br>
FEDERAL EXPRESS CORPORATION,<br>
(A/K/A FEDEX EXPRESS), and<br>
FEDEX CORPORATE SERVICES, INC.,

</div>

together with Creative Pharmacy Services (doing business as Superior Drugs), Wayne White, Anthony

Spence, Christopher Napoli, Sanford Cohen, Orlando Birbragher, Marshall Kanner, David Glass,

Michael Bezonsky, Claude Covino, Genetechnica, Physicians Online Network, The Spence Group,

Pharmacom, Carmel Management, SaveOn Rx, SafescriptsOnline, Affpower, and others known and

unknown to the grand jury, did knowingly and intentionally conspire to conduct a financial transaction

involving the proceeds of a specified unlawful activity, knowing that the property involved in the

financial transaction represented proceeds of some form of unlawful activity, and intending to promote

the carrying on of the specified unlawful activity, to wit: the possession with intent to distribute and

distribution of controlled substances outside the usual course of professional practice and not for a

legitimate medical purpose, knowing and intending that the possession with intent to distribute and

distribution was outside the usual course of professional practice and not for a legitimate medical

purpose, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(D), (b)(2), and 846 (for

conduct prior to April 13, 2009), and in violation of Title 21, United States Code, Sections 841(a)(1),

(b)(1)(E)(i), (b)(2), (h)(1), (h)(4), and 846 (for conduct after April 13, 2009), all of which conduct was in

violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (h).

<center>Manner and Means of the Conspiracy</center>

It was part of the conspiracy that:

109. It is alleged that for each package containing controlled substances that FEDEX knowingly and intentionally distributed outside the usual course of professional practice and not for a legitimate medical purpose for Superior, FEDEX requested payment for providing shipping services.

110. Wayne White, Anthony Spence, Claude Covino, Sanford Cohen, Orlando Birbragher, Marshall Kanner, Claude Covino David Glass, Michael Bezonsky, and their co-conspirators made payments in the form of wire transfers, checks, direct debit, credit card charges, and payments by telephone to FEDEX for FEDEX's shipment of controlled substances obtained outside the usual course of professional practice and not for a legitimate medical purpose for Superior.

111. The payments to FEDEX by Wayne White, Anthony Spence, Claude Covino, Sanford Cohen, Orlando Birbragher, David Glass, Michael Bezonsky, and their co-conspirators represented proceeds of the illegal sale of controlled substances outside the usual course of professional practice and not for a legitimate medical purpose by Superior and its related online and fulfillment pharmacies.

112. FEDEX employees knew that the payments from Superior and its related Internet and fulfillment pharmacies represented the proceeds of the sale of controlled substances and prescription drugs based on invalid prescriptions that were issued outside the usual course of professional practice and not for a legitimate medical purpose.

113. Some of the payments made by Superior and its related online and fulfillment pharmacies to FEDEX for the shipment of controlled substances knowingly and intentionally outside the usual course of professional practice and not for a legitimate medical purpose, which payments were made with the proceeds of the unlawful sale of controlled substances, included, but were not limited to:

| Date | Payer | Amount |
|------|-------|--------|
| 12/19/2002 | Creative Pharmacy Services, Inc. | $ 56,555.12 |
| 5/23/2003 | Creative Pharmacy Services, Inc. | $ 29,367.18 |
| 9/3/2004 | Creative Pharmacy Services, Inc. | $ 23,859.10 |
| 12/20/2005 | Creative Pharmacy Services, Inc. | $ 48,786.20 |

| Date | Payer | Amount |
|------|-------|--------|
| 10/17/2006 | Creative Pharmacy Services, Inc. | $ 25,118.98 |
| 9/18/2007 | Creative Pharmacy Services, Inc. | $ 13,067.47 |
| 1/22/2008 | Creative Pharmacy Services, Inc. | $ 19,163.53 |
| 2/3/2009 | Creative Pharmacy Services, Inc. | $ 8,582.24 |
| 3/9/2010 | Creative Pharmacy Services, Inc. | $ 532.41 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (h).

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

1 **COUNT EIGHTEEN**: (18 U.S.C. § 1956 – Conspiracy to Launder Money)

2     114.    Paragraphs 1 through 21, 72 through 87, and 93 through 106 are realleged and

3 reincorporated herein by reference.

4     115.    Beginning at a time unknown to the grand jury, but no later than November of 2003, and

5 ending on or about May 12, 2010, in the Northern District of California and elsewhere, the defendants,

6
7
8

<div align="center">

FEDEX CORPORATION,
FEDERAL EXPRESS CORPORATION,
(A/K/A FEDEX EXPRESS), and
FEDEX CORPORATE SERVICES, INC.,

</div>

9 together with Creative Pharmacy Services doing business as Superior Drugs, Wayne White, Anthony

10 Spence, Genetechnica, Physicians Online Network, The Spence Group, and others known and unknown

11 to the grand jury, did knowingly and intentionally conspire to conduct a financial transaction involving

12 the proceeds of a specified unlawful activity, knowing that the property involved in the financial

13 transaction represented proceeds of some form of unlawful activity, and intending to promote the

14 carrying on of the specified unlawful activity, to wit: the possession with intent to distribute and

15 distribution of controlled substances outside the usual course of professional practice and not for a

16 legitimate medical purpose, knowing and intending that the possession with intent to distribute and

17 distribution was outside the usual course of professional practice and not for a legitimate medical

18 purpose, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(D), (b)(2), and 846 (for

19 conduct prior to April 13, 2009), and in violation of Title 21, United States Code, Sections 841(a)(1),

20 (b)(1)(E)(i), (b)(2), (h)(1), (h)(4), and 846 (for conduct after April 13, 2009), all of which conduct was in

21 violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (h).

22 <div align="center">Manner and Means of the Conspiracy</div>

23 It was part of the conspiracy that:

24     116.    FEDEX delivered and attempted to deliver packages from Superior containing controlled

25 substances for which FEDEX had agreed to collect payment, in the form of checks and money orders,

26 from the recipients using FEDEX's cash-on-delivery (COD) service.

27     117.    FEDEX charged Superior a separate fee for use of its COD service.

28

SUPERSEDING INDICTMENT        33
CR 14-380 CRB

118. FEDEX delivered and attempted to deliver to Superior checks and money orders it had collected as COD payments for deliveries of controlled substances unlawfully ordered from Internet pharmacies, including The Spence Group, Physicians Online Network, Genetechnica, and others.

119. FEDEX knew that the money orders and checks were intended as payment for controlled substances that FEDEX had delivered and attempted to deliver from Superior to consumers. FEDEX further knew that those orders had been placed by customers after filling out an online questionnaire with no contact between the prescribing physician and patient and were thus distributed outside the usual course of professional practice and not for a legitimate medical purpose and were not based on valid prescriptions.

120. Some of the packages transported to and from Superior by FEDEX as part of FEDEX's agreement to collect payment pursuant to its COD service for controlled substances distributed outside the usual course of professional practice and not for a legitimate medical purpose, included, but were not limited to:

| Date | Amount | Recipient Location | Tracking No. |
|------|--------|--------------------|--------------|
| 2/7/2008 | $ 164.50 | Redwood City, California | 960103326342 |
| 5/27/2008 | $ 207.51 | San Mateo, California | 798448652979 |
| 8/15/2008 | $ 209.42 | Saratoga, California | 790069431423 790069431434 |
| 11/18/2008 | $ 210.50 | Philadelphia, Pennsylvania | 791185617968 791185617979 |
| 1/16/2009 | $ 199.50 | Philadelphia, Pennsylvania | 791202845992 790150248910 |
| 1/16/2009 | $ 199.50 | Philadelphia, Pennsylvania | 790150248900 791202846006 |
| 7/15/2009 | $ 157.49 | Philadelphia, Pennsylvania | 798107645420 798107645431 |
| 11/2/2009 | $ 157.49 | Philadelphia, Pennsylvania | 798119025518 798119025529 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and (h).

///

SUPERSEDING INDICTMENT     34
CR 14-380 CRB

1  **FORFEITURE ALLEGATION**:

2       121.   Paragraphs 1 through 120 of this Superseding Indictment are realleged and fully

3  incorporated herein by reference for the purpose of alleging forfeiture.

4       122.   Upon a conviction of any of the offenses alleged in Counts One through Ten and Thirteen

5  through Fifteen, the defendants,

6  <div align="center">FEDEX CORPORATION,<br>FEDERAL EXPRESS CORPORATION,</div>

7  <div align="center">(A/K/A FEDEX EXPRESS), and<br>FEDEX CORPORATE SERVICES, INC.,</div>

8

9  shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853(a)(1) and (2),

10  any property constituting and derived from any proceeds defendants obtained, directly or indirectly, as a

11  result of said violations, and any property used, or intended to be used, in any manner or part, to commit

12  or to facilitate the commission of said violations.

13       123.   Upon a conviction of any of the offenses alleged in Counts Eleven and Sixteen, the

14  defendants,

15  <div align="center">FEDEX CORPORATION,<br>FEDERAL EXPRESS CORPORATION,</div>

16  <div align="center">(A/K/A FEDEX EXPRESS), and<br>FEDEX CORPORATE SERVICES, INC.,</div>

17

18  shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any

19  property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds

20  traceable to the commission of said offenses.

21       124.   Upon a conviction of any of the offenses alleged in Counts Twelve, Seventeen, and

22  Eighteen, the defendants,

23  <div align="center">FEDEX CORPORATION,<br>FEDERAL EXPRESS CORPORATION,</div>

24  <div align="center">(A/K/A FEDEX EXPRESS), and<br>FEDEX CORPORATE SERVICES, INC.,</div>

25

26  shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

27  property, real and personal, involved in said offenses, and any property traceable to said property used to

28  facilitate said offenses.

1     125.    If any of said property, as a result of any act or omission of the defendants:

2         a.    cannot be located upon the exercise of due diligence;

3         b.    has been transferred to, sold to, or deposited with a third person;

4         c.    has been placed beyond the jurisdiction of the Court;

5         d.    has been substantially diminished in value; or

6         e.    has been commingled with other property which cannot be subdivided without

7            difficulty;

8 any and all interest defendants have in other property shall be vested in the United States and forfeited to

9 the United States pursuant to Title 21, United States Code, Section 853(p), Title 28, United States Code,

10 Section 2461(c), and Rule 32.2 of the Federal Rules of Criminal Procedure.

11

12 **SENTENCING ALLEGATION**

13     126.    With respect to the charges in this Superseding Indictment, for purposes of determining

14 the alternative maximum fine pursuant to Title 18, United States Code, Section 3571(d), the defendants,

15
<div align="center">FEDEX CORPORATION,<br>
FEDERAL EXPRESS CORPORATION,<br>
(A/K/A FEDEX EXPRESS), and<br>
FEDEX CORPORATE SERVICES, INC.,</div>

16

17

18 and their coconspirators derived gross gains of at least \$820,000,000.

19 DATED: August 14, 2014               A TRUE BILL.

20

21                                    Nancy J. Return
                                    FOREPERSON

22

23 MELINDA HAAG
   United States Attorney

24

25

   J. DOUGLAS WILSON

26 Chief, Criminal Division

27

28 (Approved as to form:
                    AUSAs Ault & Waldinger
   SUPERSEDING INDICTMENT           36
   CR 14-380 CRB